### DAYTON POWER & LIGHT CO. *v.* PUBLIC UTILITIES COMMISSION OF OHIO.

No. 609.   Argued March 13, 14, 1934.—Decided April 30, 1934.

292

*Mr. John E. Mullin,* with whom *Messrs. Edwin P. Matthews, Charles P. Pfarrer,* and *Chester J. Gerkin* were on the brief, for appellant.

*Mr. Donald C. Power,* Assistant Attorney General of Ohio, with whom *Mr. John W. Bricker,* Attorney General, was on the brief, for appellee.

MR. JUSTICE CARDOZO delivered the opinion of the Court.

The Dayton Power and Light Company, an Ohio corporation, is here as appellant challenging the validity of an order of the Public Utilities Commission of Ohio, affirmed by the Supreme Court of that state, which prescribes the rates chargeable to consumers of natural gas.

The appellant is a distributing company, producing no gas and owning no wells. The gas that it distributes it buys from the Ohio Fuel Gas Company, an affiliated corporation, delivery being made to it by the seller at the

gateways of the towns and cities where its mains and service pipes are laid. Both seller and buyer are subsidiaries of the Columbia Gas and Electric Corporation, which owns the entire capital stock of each of them as well as that of other companies producing in other fields or distributing in other cities.

On June 17, 1929, the appellant filed with the Commission a new schedule of " rates and prices " to take effect thirty days later unless suspended or annulled. The average rate of increase was 5.67 cents per thousand cubic feet. Under the authority of statute (Pence Law, 110 Ohio Laws 366, General Code, § 614–20), the Commission suspended the operation of the new schedule for 120 days, and at the same time initiated an inquiry of its own motion as to the fairness of the increase. The proceedings being undetermined at the end of the period of suspension, the statute permitted the appellant to put the schedule into effect at once upon filing a bond securing the repayment to the consumers of such portion of the increased rate as the Commission, upon final hearing, might determine to have been unreasonable or excessive. Such a bond was given on October 9, 1929. The proceeding was then continued, but a decision was not announced till November 3, 1932. There had been a pause in the hearings to await the final submission of the testimony in the case of the Columbus Gas and Fuel Company, an affiliated corporation serving other territory. Much of the testimony in that case was read into the record by stipulation as testimony in this. Upon the record thus supplemented the Commission announced its decision that the revenues under the earlier schedule were sufficient to yield a yearly net return of 6½ per cent. upon the fair value of the property, that this return was reasonable, and that more must not be charged. An order was therefore made striking the new schedule from the files of the Commission,

restraining the appellant from collecting the higher rates and directing as to the past that the difference between the old rates and the new ones, with six per cent. interest, be refunded to consumers in accordance with the bond. Upon appeal to the Supreme Court of Ohio, the order was affirmed, 127 Ohio St. 137; 187 N.E. 18, against the protest of the appellant that there had been an infringement of its privileges and immunities under the Constitution of the United States. Amendment XIV; Article I, § 10. Upon appeal to this court, Judicial Code, § 237 (a); 28 U.S.C. § 344, the protest is renewed.

At the threshold there is a controversy as to the scope of the problem before us for solution. The appellee argues that the only question for the Commission was one as to the reasonableness of the new schedule in the very form proposed: let the rates be excessive by ever so little, the schedule, it is said, was to be rejected altogether, and no other could be substituted. In opposition the appellant urges that this is too narrow a construction of the function and powers of the Commission under the applicable statute: if the proposed schedule was too high and the earlier one too low, there was a duty to fix a rate between, and thereby make the compensation adequate. We accept this broader view in the absence of a ruling to the contrary by the courts of the state. It is borne out by the terms of the bond and by the requirements of the statute under which the bond was given: such part of the new collections as shall be found to be unreasonable, that and no more is to be refunded to the customers. It is borne out again by the findings and the order: the rate is to be returned to what it had been before the change, and the difference repaid. Finally it is borne out by the opinion of the state court, which considers upon the merits the objections enumerated by the appellant in its petition to review the order of the Commission, and finds them all to be untenable.

With the field of inquiry thus charted, we turn to the objections in the effort to determine whether separately or collectively they support the claim of confiscation.

They fall into three classes: (1) objections to the computation of operating expenses; (2) objections to the valuation of the property making up the rate base; and (3) objections to the rate itself.

*First. Objections to the computation of operating expenses.*

The chief item of controversy under this head is the price payable to the affiliated seller for gas delivered at the gates.

The contract between the appellant and the Ohio Fuel Gas Company called for payment at the rate of 45 cents per thousand cubic feet; the Commission found this price to be excessive to the extent of 6 cents, thereby reducing to 39 cents the allowance to be made as a proper operating expense.[1] There is no doubt under the decisions of this court that the Commission was not concluded by the price fixed in the agreement. This results from the relation of intimate alliance between the buyer and the seller. They were not dealing with each other at arm's length, and the prices that they fixed in their intercompany transactions were of no concern to the consumer unless kept within the bounds of reason. *Western Distributing Co.* v. *Public Service Commission of Kansas,* 285 U.S. 119; *Smith* v. *Illinois Bell Telephone Co.,* 282 U.S. 133; *United Fuel Gas Co.* v. *Railroad Commission of Kentucky,* 278 U.S. 300, 320. Whether the bounds were overpassed or heeded is next to be considered.

■ First in order of importance is the value of the gas fields.

---

[1] The appraisal of the appellant's property at the amount fixed by the Commission will allow a return of $6\frac{1}{2}\%$ if operating expenses are lowered by this reduction of the gateway price. At the contract price of 45 cents the return will be less.

The Ohio company, the seller, does not own its fields in fee. It does own leases covering nearly three million acres in Ohio and elsewhere. Some of these it uses as a source of supply to meet the present needs of customers. Others are held as a standby for the future. Are all to be included in determining the base on which a fair price is to be reckoned? Are some to be ruled out until the wells now in use are wholly depleted, or until depletion is near at hand? If some or all are to be included, what shall be the principle of appraisal: shall it be market value, or value as shown by the books, or some compromise between them?

These and like questions have been much debated in the opinions below and in the arguments of counsel. They suggest interesting and important problems in the process of rate making for companies with wasting assets. When regard is had, however, to what has been done by the Commission and the state court as distinguished from what has been said, the case assumes another aspect. Much of the debate is then perceived to be irrelevant to the issue of confiscation *vel non*—confiscation, that is to say, of the property interests of the appellant—which in ultimate analysis is the only issue to be determined. To bring this out more clearly there is need to amplify the statement of the subject matter to be valued and the mode of valuation.

The leaseholds, operated and unoperated, are grouped into four classes. Class No. 1 (291,396 acres) is made up of "tracts of land having producing gas wells drilled thereon from which gas is being furnished to the public." Class No. 2 (164,739 acres, unoperated) is made up of "tracts of land proved by actual developments and operations in the immediate vicinity thereof to be good gas-producing lands, but which do not have any producing wells drilled thereon." Class No. 3 (312,631 acres, unoperated) is made up of "tracts of land shown by sur-

rounding or neighboring developments of operations, geological considerations, etc., to be reasonably certain to be good gas land, at least as to large portions thereof, but not yet demonstrated to be such by actual drilling." Class No. 4 (2,065,421 acres, unoperated) is made up of " tracts of land situate within the areas of territory where gas sands are known or assumed to exist from general geological conditions, but which are so remote from actual gas-producing wells or territory that they are merely prospective gas lands."

The Commission has stated in its opinion that the leases in class No. 1 are the only ones that are presently " used and useful " in the public business of the owner, and hence the only ones to be valued in estimating a fair return.[2] The Commission has also stated in effect that there was no satisfactory evidence before it either of market or of intrinsic value for any portion of the acreage. This is what was said, but what was done was different. The value of the 291,396 acres in class No. 1 was $1,569,-479 on the basis of their original cost with certain overheads and expenses added; the book value of the other classes, after deducting what is found to have been an arbitrary write up of about $3,700,000, was $3,160,765, a total for all classes of $4,730,244.[3] Instead of resorting to those tests the Commission made an allowance of $25 per acre for the 291,396 acres in class No. 1, selecting that figure because it had been approved by the Supreme Court

---

[2] Under the Ohio law a corporation selling its entire product to public utilities which in turn sell that product to consumers is itself a public utility if the shares are owned by the same persons. *Ohio Mining Co.* v. *P. U. Comm'n,* 106 Ohio St. 138, 146, 150; 140 N.E. 143.

[3] The Ohio Fuel Gas Company took over in June, 1929, the leases of an affiliated company, the Logan Gas Company and its predecessor, the Logan Natural Gas and Fuel Company. These leases, after being carried on the Logan books at about $2,500,000, were marked up in 1919 so as to show an increase in value of $3,748,036.48.

of Ohio in another litigation affecting part of the same lands. *Logan Gas Co.* v. *Public Utilities Comm'n,* 124 Ohio St. 248; 177 N.E. 587. The result was an appraisal of $7,284,900, which was about $2,500,000 more than the book value of all the leases in classes 1 to 4 inclusive. On appeal this method of valuation did not pass without impeachment. The Supreme Court of Ohio said in its opinion (*Columbus Gas & Fuel Corp.* v. *Public Utilities Commission of Ohio,* 127 Ohio St. 109; 187 N.E. 7; *Dayton Power & Light Co.* v. *Public Utilities Commission of Ohio,* 127 Ohio St. 137; 187 N.E. 18) that the appraisal at the rate of $25 per acre was too high, and that the limit of the allowance should have been the book value of the leases in class No. 1. Once more there must be a distinction between what was said and what was done. Criticizing the appraisal of the Commission as over-liberal to the company, the court affirmed the order which had been made on the assumption that there should be an allowance of $7,284,900 because of the ownership of leases. The appellant may not prevail unless there has been error in the result as well as error in the reasoning. Is the appraisal of the leases at over seven million dollars an arbitrary act, which in turn has brought about an arbitrary rejection of the contract for gas delivered at the gates, and hence an infringement of constitutional immunities?

As to that issue the burden of proof rests heavily on the appellant. *Los Angeles Gas & Electric Corp.* v. *Railroad Commission of California,* 289 U.S. 287, 304, 305. In the endeavor to sustain it there has been an attempt to establish market and intrinsic values by the estimates of experts as well as by actual sales.

Webber, a witness for the appellant, placed the value of the leases in class No. 1 at $11,473,717; Meals at $17,483,760; Wittmer at $21,825,000, and Dally at $26,225,640. For class No. 2 the estimates were: (Webber), $10,-

440,300; (Meals), $9,884,340; (Wittmer), $12,300,000; (Dally), $16,473,900. For class No. 3, (Webber), $10,-504,320; (Meals), $1,250,524; (Wittmer), $3,120,000; (Dally), $6,252,620. For class No. 4, (Webber), $6,196,-263; (Meals), $8,261,684; (Wittmer), $6,195,000; (Dally), $4,130,842. Variations so wide are sufficient of themselves to disprove the existence of a market in the strict or proper sense. *Sinclair Refining Co.* v. *Jenkins Petroleum Process Co.*, 289 U.S. 689, 697, 698, 699. If they have any probative effect, it is that of expressions of opinion by men familiar with the gas business and its opportunities for profit. But plainly opinions thus offered, even if entitled to some weight, have no such conclusive force that there is error of law in refusing to follow them. This is true of opinion evidence generally, whether addressed to a jury (*Head* v. *Hargrave,* 105 U.S. 45, 49) or to a judge (*The Conqueror,* 166 U.S. 110, 131, 133), or to a statutory board. *Uncasville Mfg. Co.* v. *Commissioner,* 55 F (2d) 893, 897; *Tracy* v. *Commissioner,* 53 F. (2d) 575, 577; *Anchor Co.* v. *Commissioner,* 42 F. (2d) 99, 100; *Gloyd* v. *Commissioner,* 63 F. (2d) 649, 650. There are reasons why the principle has special application here. In the first place, the intrinsic value of the leases is dependent upon the capacity of the lands to yield productive wells, a capacity seldom to be judged with even a fair approach to certainty until tested by experience. *Natural Gas Co. of W.Va.* v. *Public Service Comm'n,* 95 W.Va. 557, 569; 121 S.E. 716. In the second place, the profits to be earned in a regulated business must vary with the rates established by the supervising agencies of government, with the result that prophecies, however radiant, may be upset overnight by the publication of a lower schedule. The witnesses for the appellant were alive to these possibilities of surprise and disappointment, and there are admissions that their chief interest was in an unregulated market. To these perturbing tendencies, all operating to weaken

the persuasive force of their opinions, there must be added still another, that of interest or bias, conscious or unconscious. Webber, a broker, was a stockholder in the Columbia Gas and Electric Company, the parent corporation. For fifteen years he had been in the service of the Ohio Fuel Supply Co., the predecessor of the Ohio Fuel Gas Co. He had been a witness for the appellant in other litigations. Meals was the president of a gas company, had been engaged in the gas business for over forty years and had testified in other suits. Wittmer was the owner of gas fields and sold his gas to the Ohio Fuel Gas Company and affiliated corporations. Dally was in the same position. The testimony of all is subject to the infirmities that were pointed out by this court in another rate controversy involving fields in West Virginia. *United Fuel Gas Co.* v. *Railroad Commission of Kentucky*, 278 U.S. 300, 316. It is not based, at least to a controlling extent, " on prevailing prices for gas leases or on actual sales." It is based upon " an estimated or assumed exhaustible supply of gas available to appellants until exhausted, and upon a predictable price for natural gas in unregulated markets " through a future period of years. Cf. *Charleston* v. *Public Service Comm'n,* 110 W.Va. 245; 159 S.E. 38. How uncertain are the data can be gathered from the variant results.

The appellant has attempted to correct these uncertainties by supplementing the opinions of its experts with testimony of actual sales. But they were sporadic transactions, separate in time and space, and at prices too disparate to supply a helpful test of value. Thus in 1929 Wittmer sold 101,600 acres of Ohio leaseholds to the Penn-Ohio Gas Co. for $1,085,000, and in the same year bought 7,000 acres for $100,000. About the same time, Meals made a sale of 21,000 acres for $2,500,000. Dally had made purchases at prices ranging from $2 an acre for leaseholds of the quality of class No. 4 up to $50 or $75 an acre

for leaseholds of a higher grade. Over against the evidence of these prices must be set the evidence that class No. 1 leases, acquired by the appellant in 1927, 1928 and 1929, had been bought at an average price of $2.05 an acre, and if three leases be excluded, at an average of 62¼ cents an acre. Then too, there are quantitative considerations that are not to be ignored. For the most part the prices stated by the appellant's witnesses had been paid for small tracts, if comparison be made with the vast and often unproved acres in controversy here. Nor is there any such uniformity of price as to suggest the existence of a standard. Meals sold 21,000 acres for more than Wittmer sold a tract almost five times as large. Indeed, the truth becomes obvious when one reads the testimony as a whole that the prices upon sales were playing a subordinate rôle, and that the ultimate appraisal was a forecast of productive power. Granting even that the testimony had an evidential value, it had that and nothing more. It had no such commanding quality as to apply coercion to the judgment of the appointed triers of the facts, and exclude every choice but one.

We do not attempt to determine upon this record whether the Commission and the state court were in error in expressing the opinion that only class No. 1 leases should have a place in the appraisal. On the one side it is argued (cf. *Wichita Gas Co.* v. *Public Service Comm'n,* 2 F.Supp. 792, 799) that the discretion of the owner as to the extent of the reserve essential for prudent management ought not to be overridden by a court unless proved by convincing testimony to have been fraudulent or arbitrary. On the other side it is argued (cf. *Wichita Gas Co.* v. *Public Service Comm'n, supra,* p. 816; *United Fuel Gas Co.* v. *Public Service Comm'n,* 14 F. (2d) 209, 221) that the values of reserve leases acquired by the owner to supply the needs of a remote future are not a part of the rate base upon which profits are presently to be earned at

the cost of the consuming public, though they may be brought into the base afterwards when the time to use them is at hand. Moreover, the very reason for including in operating expenses a depletion allowance that will amortize wasting assets is to make provision for a fund out of which capital may be replenished by the purchase of other leases if that use is thought to be preferable to dividing the fund among the shareholders and winding up the business. These and other arguments we put aside without expression of a choice, and this for the reason that the case as it has shaped itself does not require us to weigh them. Again we emphasize the distinction between dictum and decision. If that distinction is observed, the upshot of the case is seen to be that the Supreme Court of Ohio, with authority to revise the findings of the Commission in respect of fact and law (*Hocking Valley Ry. Co.* v. *Public Utilities Comm'n,* 100 Ohio St. 321, 326, 327; 126 N.E. 397), has disapproved the appraisal of the No. 1 leaseholds at $25 an acre, has found the testimony insufficient to establish a value beyond that shown by the books, but has, none the less, upheld an order whereby rates have been fixed upon the basis of the book value of leases of every class (numbers 1 to 4 inclusive), and $2,500,000 besides. If the evidence would have been adequate to uphold a lower rate, *a fortiori* it was adequate to uphold the rate prescribed. Plainly in all this there has been no infringement of constitutional immunities unless a higher value has been made out by evidence too strong to be rejected. But for reasons already stated, the evidence is lacking in that high coercive power. Court and commission were free in their discretion to reject as unsatisfactory the conflicting opinions of a group of friendly experts. They were free in their discretion to refuse to draw an inference of value from the prices stated to have been paid upon a few purchases and sales. If those data were unacceptable, the only

others left were the entries in the books, and these perforce were followed for lack of anything better. The result is to reproduce the situation that was found and commented on in a suit by the United Fuel Gas Company, an affiliated corporation. *United Fuel Gas Co.* v. *Railroad Commission of Kentucky,* 278 U.S. 300, 318. " On the record as made, appellants have failed to present any convincing evidence of value of their gas field which would enable us to assign to it any greater value than that which they appear to have assigned to it on their books. This book value, therefore, may be accepted not as evidence of the real value of the gas field, but as an assumed value named by the appellants, which, on the evidence presented cannot reasonably be fixed at any higher figure." Cf. *United Fuel Gas Co.* v. *Public Service Commission of West Virginia,* 278 U.S. 322, 326.

■ Amortization and depletion.

In determining the price to be paid by the appellant for gas delivered at the gates, the Commission included among the operating expenses of the affiliated seller an annual allowance of $4,158,954 to amortize the value of leaseholds No. 1 (the only leaseholds then in use) and of the well-structures and equipment used in connection therewith, and thus provide a fund that would restore the depleted capital when the gas had been exhausted.

The Supreme Court of Ohio expressed the view in its opinion that this allowance was not permissible under the statutes of the state. None the less it affirmed the order of the Commission which fixed the rate of gas on the assumption that a charge for amortization was properly included in the operating expenses. In such circumstances the appellant is not aggrieved through the expression of a belief that the rate would have been lawful if the charge had been omitted.

The amount of the allowance is adequate and even liberal. It was made on the assumption (1) that the value

of the gas fields in class No. 1 was $25 an acre, and (2) that the life expectancy of the contents of the wells and of the appurtenant structures and equipment was only three years and two months. Both assumptions are erroneous, though the error results to the appellant's benefit. As to assumption (1), the state court has held that there is no satisfactory evidence of the value of the leases in class No. 1 in excess of the value assigned to them upon the books. A depletion allowance must therefore be excessive if it is made in the belief that a value of $25 per acre is the amount to be restored. As to assumption (2), there has been an underestimate of the life expectancy of the gas content of the wells, resulting once more in an exaggerated allowance for inroads upon capital. The prediction may have been correct in respect of the wells already driven and in use, though this is far from certain, but it was certainly too low if expectancy is to be measured by sources of supply in the 291,000 acres that had never been tapped and were available for the future.

The effect of these errors, and indeed of the first of them alone, without attempting to estimate the consequences of the second, is to make the amortization charge excessive to the extent of $761,098.50. In figuring the charge the present value of the leases was treated as 41.8874 per cent. of $7,284,900, or $3,051,455; that of the gas well construction as $5,944,692, and that of the gas well equipment as $4,069,434, a total of $13,065,581. The actual present value of the leases in class No. 1 was not more than 41.8874 per cent. of $1,569,479, or $657,414. The fund to be restored through amortization was thus overestimated to the extent of $2,394,041 or $18\frac{3}{10}$ per cent., which would reduce the annual charge, without change of the life expectancy, from $4,158,954 to $3,397,-865.50.

We have assumed in what has been written that for the purpose of amortization the leases in class No. 1 are

to be taken at the value shown on the books. The appellant will be little helped, however, if another standard is accepted. No method of valuation supported by the record will lay a basis for a holding that the allowance is inadequate to the point of confiscation. The truth seems to be, as was stated by a witness for the appellant, that the percentage of depletion appropriate for gas fields is " the wildest sort of guess." This results from many circumstances, not the least of which is the probability of improved methods of production. In an industry subject to these rapid changes the prophecies of one year are likely to be overturned by the experience of the next.

We think the allowance for depletion, instead of being too small, is so manifestly excessive as to supply a margin for the correction of other contested items that may approach the border line. *Los Angeles Gas & Electric Corp.* v. *Railroad Commission of California, supra,* p. 317.

■ Reserve for depreciation.

The Commission allowed as a charge against the operating expenses of the affiliated seller an annual reserve of $667,612 to be placed in a sinking fund and devoted to the maintenance of the plant, with the exception of the wells and their equipment which had been separately cared for in the allowance for depletion.

The appellant has failed to show in any conclusive or convincing way that this reserve will be inadequate.

The Commission also allowed as a charge against the appellant's operating expenses an annual reserve in the amount of 2% of the " depreciable property " employed by the appellant in the business of distribution.

The percentage so fixed is stated to be in accord with the practice of the appellant as disclosed in its annual reports on file with the Commission.

The contention that the percentage of allowance should have been 4 per cent. instead of 2 has no basis in the evidence.

■ Accrued Depreciation.

In determining the price to be paid for gas delivered at the gateways, the Commission appraised the wells and equipment of the affiliated seller as having suffered a depreciation of 58.1126 per cent. The appellant insists that the depreciation is excessive.

There is evidence that the method of computation adopted by the Commission is in accordance with the accepted practice of mining engineers. The practice is to ascertain the rock pressure at the initial flow of the gas and again at the time of the appraisal, and to measure the depreciation by the reduction thus disclosed. The wells and their equipment have only a scrap value after the exhaustion of the gas, and contents and containers thus depreciate together.

The appellant, though complaining that the percentage of depreciation is excessive, has had a benefit, more than equivalent to any injury, in the enhancement of the allowance for amortization and depletion.

■ The disallowance of the " delay rentals " for unoperated leases.

To keep alive the leases acquired as a reserve the affiliated seller paid the annual carrying charges (known as " delay rentals "), and there is objection to the exclusion of the payments from operating expenses.

We think it a sufficient answer that the annual amortization allowance of $4,158,954 has made provision for a fund whereby new leases can be acquired and paid for out of current earnings. Operating expenses are magnified unduly if they cover both the fund and the payments that are made out of it.

■ The rate of 45 cents per thousand cubic feet viewed in the aspect of a customary charge.

An attempt is made to show that the price paid by the appellant to the affiliated seller was the current or market rate in contracts between producers and distributors in

other towns and cities. To bolster up that argument a schedule of contracts was marked as an exhibit. Twenty-five contracts are listed. There is a concession that in all but two the seller is the Ohio Fuel Gas Company or an affiliated corporation. There is no evidence as to the relation between the seller and the buyers. For all that appears the buyers in most instances are parts of the same system. The prices are not uniform: many are higher than 45 cents, but some are lower, one of them being as low as 39 cents. Distances and other geographical conditions affecting the cost of transportation and delivery are undescribed and unexplained.

The Commission did not err in its determination that this was inconclusive evidence.

■ The general administrative expenses incurred by the appellant in the conduct of its business.

These, as claimed by the appellant, were $38,395; the Commission reduced them to $32,432.

A contract had been made with the Columbia Engineering and Management Corporation, an affiliated company, for services as manager in return for a percentage of the gross earnings. This item ($13,741) was found by the Commission to be excessive to the extent of $5,963, and the compensation was reduced accordingly. In view of the close relation between the affiliated companies, the burden was upon the appellant to sustain the fairness of the contract. We cannot hold that it did so in opposition to the judgment of a Commission acquainted with prices and other conditions in the localities affected.

We have now considered the objections to the allowance and disallowance of operating expenses.

To determine whether 39 cents per thousand cubic feet is a fair price to be paid for gas delivered at the gates, there has been need to consider the assets and expenses of the affiliated seller, for only thus has it been possible to estimate a fair return.

We have kept in mind the principle that "rates substantially higher than the line between validity and unconstitutionality properly may be deemed to be just and reasonable, and not excessive or extortionate." *Banton* v. *Belt Line Ry. Corp.*, 268 U.S. 413, 423.

Even so, the burden of proof was on the buyer of the gas to show that in these transactions with the affiliated seller the price was no higher than would fairly be payable in a regulated business by a buyer unrelated to the seller and dealing at arm's length. *Western Distributing Co.* v. *Public Service Commission of Kansas*, 285 U.S. 119, 124.

State court and Commission did not act in an arbitrary fashion when they held upon the evidence before them that the burden had not been borne.

There are certain other objections that have relation to the value of the appellant's property, and not to its expenses of operation or to the value of the property of the affiliated seller.

To these we now turn.

*Second. The value of appellant's property.*

(a) Objection is made that the going value of the appellant's business should have been included in the base.

The decisions of this court show what going value means (*Los Angeles Gas & Electric Corp.* v. *Railroad Commission of California, supra,* p. 313), distinguish it from good will, and hold that upon proof of its existence it may have a place in the base upon which rates are to be computed. The Commission was of opinion that there was here no constituent of property that called for separate appraisal apart from the recognition that had been given it as a contributory factor in other elements of value.

The appellant is a new company, engaged in business for a few years. The value of its physical assets is less than a million dollars. In the brief term of its existence it professes to have added to that value from $125,000 to

$140,000 by combining the parts into an organism and causing them to work together. The Commission took the view that whatever increment of value had emerged from these sources was sufficiently reflected in the allowance of the cost of developing " new business " and in the appraisal of the physical assets as parts of an assembled whole. A like conclusion has been reached by this court in very similar conditions. *Los Angeles Gas & Electric Corp.* v. *Railroad Commission of California, supra,* p. 314. Going value is not something to be read into every balance sheet as a perfunctory addition. " It calls for consideration of the history and circumstances of the particular enterprise." *Los Angeles Gas & Electric Corp.* v. *Railroad Commission of California, supra,* p. 314. Here the company was a small one and its organization simple. There was no diversified and complex business with ramifying subdivisions. We cannot in fairness say that after valuing the assets upon the basis of a plant in successful operation, there was left an element of going value to be added to the total. Even if the addition might have been made without departure from accepted principles, the omission to make it does not appear to have been so unreasonable or arbitrary as to overleap discretion and reach the zone of confiscation. " It is necessary again, in this relation, to distinguish between the legislative and judicial functions." *Los Angeles case, supra,* p. 314. Much that the framers of a schedule are at liberty to do, this court in the exercise of its supervisory jurisdiction may not requre them to do. For the legislative process, at least equally with the judicial, there is an indeterminate penumbra within which choice is uncontrolled.

(b) A number of other objections may conveniently be grouped together.

The appellant complains of the refusal to make allowance for organization or pre-construction costs. There is no evidence that any were incurred, though this of itself

is indecisive. *Ohio Utilities Co. v. Public Utilities Comm'n*, 267 U.S. 359, 362. It is conjectural whether they would be incurred in the hypothetical event of a reproduction of the business, and, if incurred, in what amount. The appellant's position as a member of an affiliated system would have a tendency to reduce such expenses to a minimum. We think the ruling is supported by decisions of this court. *Los Angeles Gas & Electric Corp. v. Railroad Commission of California, supra,* p. 310; *Wabash Valley Electric Co. v. Young,* 287 U.S. 488, 500. To this it is to be added that the item is of negligible importance. Its presence or absence would not make the difference between confiscation and a fair return. We do not figure to so fine a point in determining the application of the constitutional restraints of power.[4] An intelligent estimate of probable future values (*Southwestern Bell Telephone Co. v. Public Service Comm'n,* 262 U.S. 276, 288), and even indeed of present ones, is at best an approximation. The like is true of a forecast of the extent of future revenues. There is left in every case a reasonable margin of fluctuation and uncertainty.

The appellant complains also of the failure to include the hypothetical expense of financing the business as part of the cost of reproduction.

Considering the absence of evidence that any such expense had been incurred when the business was established and the uncertainty that it would be incurred if the plant were destroyed and reproduced, we think this item under recent decisions was properly rejected as remote and conjectural. *Wabash Valley Electric Co. v. Young, supra,* p. 500; *Los Angeles Gas & Electric Corp.*

---

[4] The appellant's yearly revenues during the period of inquiry were $666 in excess of the amount of money needed to yield a return of 6½ per cent. on the value fixed by the Commission. If pre-construction costs were to be added to the full extent claimed, the rate of return would be about .064.

v. *Railroad Commission of California, supra,* p. 310. We are to remember that the cost of reproduction is a guide, but not a measure. *Los Angeles Gas & Electric Corp.* v. *Railroad Commission of California, supra,* p. 307.

What has been said of the foregoing items applies with little variation to the reduction of " general overheads," or undistributed expenses during the period of construction, from 17%, the amount claimed by the appellant, to 14%, the amount allowed by the Commission.

The cost in imaginary conditions of cutting and restoring pavements was not an increment of value. *Des Moines Gas Co.* v. *Des Moines,* 238 U.S. 153.

The amount necessary for working capital was carefully computed, and has not been proved to be too small for the requirements of the business.

*Third. The rate of return on the investment.*

The appellant contends that to avoid confiscation the rate of return should be 8 per cent., instead of 6½, which was allowed.

In view of business conditions, of which we take judicial notice (*Atchison, Topeka & Santa Fe Ry. Co.* v. *United States,* 284 U.S. 248, 260), the rate allowed was adequate. *Los Angeles Gas & Electric Corp.* v. *Railroad Commission of California, supra,* p. 319.

Whether a lower rate could be upheld is a question not before us.

Dissection of the several items that have been criticized in the appellant's argument has thus brought us to the conclusion that the order of the Commission, whether generous or ungenerous, is at all events not confiscatory, and hence not subject to revision here. But the conclusion has reinforcements that come to it from other avenues of approach. In a statement put in evidence by the appellant, the rate of return under the new schedule is said to be $1\frac{28}{100}$ per cent. of the fair value of the property. Under the earlier schedule the revenue was even less. So modest

a rate suggests an inflation of the base on which the rate has been computed. It is a strain on credulity to argue that the appellant, when putting into effect a new schedule of charges, was satisfied with one productive of so meagre a return. The same surprise is excited when we consider what it claims as to the fair value of the gas delivered at the gates. All that the affiliated seller asks is 45 cents per thousand cubic feet, yet according to the appellant's figures nearly 7 cents more, or a price of about 52 cents, is necessary to protect the seller against the wrong of confiscation. The argument proves too much: the valuations are discredited by the teachings of experience. Men do not transact business without protest at confiscatory rates, at all events in the absence of extraordinary circumstances making submission to the loss expedient. If such circumstances exist, the appellant has not proved them. Nothing in the record lays the basis for a belief that the natural gas business in Ohio is unable to pay its way. That being so, what the public utility has done belies what it has said. We shall hardly go astray if we prefer the test of conduct.

Upon the submission of the cause the appellant made a motion to amend its assignments of error, which motion is now granted. The decree of the Supreme Court of Ohio, affirming the order of the Public Utilities Commission, does not impair any privileges or immunities secured to the appellant by the Constitution of the United States, and must therefore be

*Affirmed.*

MR. JUSTICE VAN DEVANTER and MR. JUSTICE SUTHERLAND took no part in the consideration or decision of this case.

MR. JUSTICE MCREYNOLDS and MR. JUSTICE BUTLER concur in the result.