**D. C. TRANSIT SYSTEM, INC.,**
Petitioner,

v.

**WASHINGTON METROPOLITAN AREA TRANSIT COMMISSION, Respondent.**

**No. 24586.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 23, 1971.

Decided Nov. 24, 1971.

Mr. Harvey M. Spear, New York City, for petitioner.

Mr. Stephen L. Sharfman, Attorney, Washington Metropolitan Area Transit Commission, for respondent. Mr. Douglas N. Schneider, Jr., General Counsel, Washington Metropolitan Area Transit Commission, was on the brief for respondent.

Before TAMM and ROBB, Circuit Judges, and ADAMS,* Circuit Judge,

* Sitting by designation pursuant to 28 U.S.C. § 291(a) (1964).

United States Court of Appeals for the Third Circuit.

ADAMS, Circuit Judge:

This case involves a petition by D.C. Transit System, Inc. (Transit) to review Orders Nos. 1052 and 1078 of the Washington Metropolitan Area Transit Commission (WMATC). Order No. 1052 set forth findings and conclusions regarding Transit's application for a fare increase, and Order No. 1078 denied reconsideration of Order No. 1052.

On March 13, 1970, Transit filed proposed revisions of its tariffs with WMATC. These proposed revisions were based upon predictions of Transit's financial performance during a selected future period from July 31, 1970 to July 31, 1971. Extensive hearings on these proposed revisions were held, and both Transit and WMATC's staff (staff) presented estimates as to Transit's future performance. Although WMATC authorized rate increases for nearly all of Transit's routes, Transit claims that the increases are insufficient to produce a fair rate of return. Transit argues that WMATC erred in its findings and conclusions with respect to five factors bearing on Transit's predicted performance during the future annual period: estimation of passenger revenue; projection of the cost of disposing of lawsuits; amortization of a deficiency in the reserve for injuries and damages; the effect of an increase in the Minibus fare; and an estimation of revenue from charter service.

█ Section 17(a) of the Compact for Mass Transportation between Virginia, Maryland, and the District of Columbia provides: "The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive." If WMATC has exercised its discretion rationally, has made findings supported by the record, and has applied correct legal standards, then it is of no import that "conflicts in the evidence might conceivably have been resolved differently, or other inferences drawn

from the same record." Payne v. WMATC, 134 U.S.App.D.C. 321, 334, 415 F.2d 901, 914 (1968). *See* Williams v. WMATC, 134 U.S.App.D.C. 342, 362, 415 F.2d 922, 942 (1968), cert. denied, 393 U.S. 1081, 89 S.Ct. 860, 21 L.Ed.2d 773 (1969). It is with respect to this test that we review the decision of WMATC.

█ Transit first argues that WMATC erred in adopting Transit's own estimates of regular route ridership and resulting revenue, rather than adopting its own calculations which indicated that Transit's estimate might be too high. Transit's projection of ridership during the future annual period was based upon an annualization of the actual ridership during the 13 week period following the fare increase of October 26, 1969. The ridership forecast prepared by the staff, which exceeded Transit's by 419,703, was predicated upon the actual results of the five months immediately following the October, 1969, fare increase. WMATC performed its own calculation based upon more recent data, and noted that the calculation indicated that Transit's estimate could be high. Nevertheless, WMATC adopted Transit's figures for two reasons: (1) the burden of proving entitlement to fare increases rests with Transit, and (2) even if revenues were less than estimated, Transit would still earn enough to cover its expenses. Any loss to Transit would only reduce the rate of return.

█ Although "a regulatory agency is duty bound to make its forecasts as accurate as it possibly can", Williams v. WMATC, 134 U.S.App.D.C. at 393, 415 F.2d at 973, WMATC was not derelict in this duty merely because its calculation, based on more recent data, indicated that Transit's estimate might be high. WMATC's calculation was an independent check of the estimates on record, and not a finding of fact. The estimate was based upon a period for which an annualization calculation had not been verified. And most importantly, these calculations had not been subjected to the

scrutiny of the various parties in the rate proceedings. Finally, the rate of return was adjusted upward to 5.21% to cover the contingency of a miscalculation of ridership revenue. Even assuming that the WMATC estimate were utilized, Transit would still be able to maintain a profit level of 4.86%. Despite any inaccuracy, then, the use of Transit's figures rather than WMATC's "would not make a difference between confiscation and a fair return." Dayton Power and Light Co. v. Public Utilities Comm'n, 292 U.S. 290, 54 S.Ct. 647, 78 L.Ed.2d 1267 (1934).

■ In its next argument, Transit contends that WMATC erred when it determined that the annual credit to the reserve for injuries and damages—that amount set aside to settle outstanding suits—should be increased by $600,000. Transit asserted that the credit should have been increased by $662,000, whereas the staff stated that the increase should amount only to $556,000. The difference between the estimates arose out of the calculation of the average cost of disposing of lawsuits during the future annual period. Both parties agreed that 335 suits would be disposed of during that period, and both utilized 1969 data in reckoning their estimates. Transit used the following formula to estimate the average cost:

$$\text{Average cost} = \frac{\text{total dollar amount paid to claimants in 1969}}{\text{total dollar claims asserted in 1969 suits}}$$

$$\times \frac{\text{total amount claimed in suits outstanding on March 31, 1970}}{\text{total number of suits outstanding on March 31, 1970.}}$$

By this formula, the average cost of each lawsuit would be $2,185.79. The staff, on the other hand, used a different formula for reaching its estimate:

$$\text{Average cost} = \frac{\text{cost of disposing of suits in 1969}}{\text{number of suits disposed of in 1969}}$$

———◆———

This calculation resulted in a quotient of $1,961, which was rounded off to the final estimate of $1,900. WMATC utilized the staff's formula, but adjusted the estimate upward to $2,000.

Both formulae appear to be valid methods of estimating the average cost of disposing of lawsuits during the future annual period, although it might have been better practice for each party to have tested its assumptions by showing that its method was accurate in the light of the history of other recent prior years. Transit asserts that WMATC's method did not contemplate the effect of inflation, but WMATC has pointed out that Transit offered no such proof during the hearings. In any event,

WMATC asserts that by rounding its estimate upward rather than downward, it did, in effect, allow for inflation. Because there is substantial evidence in the record to support the finding of WMATC regarding the reserve for injuries and damages, the finding should be treated as conclusive.

■ In connection with the reserve for injuries and damages, Transit argues that WMATC had acted arbitrarily and capriciously in not allowing the amortization of a deficiency of $916,257 over a period of three years. The staff had concurred in the existence of a deficiency, but had disagreed as to the amount. WMATC rejected the methodology of both Transit and the staff,

and decided to hire an outside consultant to study the matter, stating that appropriate adjustments to the reserve allowance would be made at the next opportunity. It appears, therefore, that this item was merely deferred rather than totally disallowed, and in view of WMATC's duty to forecast as accurately as possible, the deferral does not seem arbitrary or capricious.

■ Transit's fourth argument is that WMATC's refusal to authorize a fare increase for Minibus service from $.10 to $.20 was erroneous, arbitrary, and not supported by the record. WMATC had denied the increase on the ground that the slight increase in revenue which would result after allowing for reduced ridership was outweighed by a substantial reduction in patronage, which could result in the eventual destruction of the Minibus operation. Although there is no substantial evidence —direct or otherwise—that the service would eventually be destroyed, Transit's own estimates indicated that while patronage would decline by 33%, the higher fare would result in an increase of revenue of only $28,004. In view of the fact that adjustment in the operation designed to cut costs and improve service had been made only a few months prior to the decision and that the results of the adjustments were not yet known, WMATC's action was within its discretion, and clearly was neither arbitrary nor capricious.

■ The final assertion of error is that there is no rational basis for WMATC's adoption of the staff estimate of charter service revenue for the future annual period. However, the staff's conclusion was based on an analysis of an 8-year historical period. Testimony introduced to support Transit's estimate that charter service revenue would decline, contained no such analysis. Transit's primary witness did describe the factors upon which Transit relied, but WMATC found such testimony unconvincing and did not believe it. We conclude, therefore, that there is substantial evidence

in the record to support WMATC's findings with respect to charter revenue.

For the above reasons, the orders of the Washington Metropolitan Area Transit Commission, in the particulars reviewed herein, will be affirmed, and the petition for review will be denied.