**D. C. TRANSIT SYSTEM, INC., a corporation, Petitioner,**

v.

**WASHINGTON METROPOLITAN AREA TRANSIT COMMISSION, Respondent.**

**No. 23958.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 17, 1970.

Decided June 28, 1973.

Harvey M. Spear, New York City, for petitioner.

Douglas N. Schneider, Jr., Gen. Counsel, Washington Metropolitan Area Transit Commission, Washington, D. C., for respondent.

Before ROBINSON and MacKINNON, Circuit Judges, and DAVIS,* Judge, U. S. Court of Claims.

MacKINNON, Circuit Judge:

This case arises from a petition filed by D. C. Transit System, Inc. (Transit) for review of certain orders of the

---

* Sitting by designation pursuant to 28 U.S.C. § 293(a).

Washington Metropolitan Area Transit Commission (the Commission). The petition was filed pursuant to section 17(a) of Title II, Article XII of the Washington Metropolitan Area Transit Regulation Compact (the Compact),[1] which permits judicial review of Commission orders either by this court or by the United States Court of Appeals for the Fourth Circuit.

Transit filed new tariffs with the Commission on May 29, 1969, which sought Commission approval to accomplish various increases in the fares charged by Transit for transportation by bus within the Washington Metropolitan Area. Under the authority of section 6(a) of the Compact, the Commission suspended the effectiveness of the proposed fares pending public hearings before the Commission on their lawfulness. Following the hearings, where numerous intervening parties participated, the Commission served its Order No. 984 (unreported), which is the principal focus of the complaints now leveled by Transit against the Commission. In Order No. 984, the Commission concluded generally that Transit was entitled to a fare increase but that the amount of the increase was excessive, and accordingly the Commission itself proceeded to fix Transit's fares at a level found to be just and reasonable. Transit applied to the Commission for reconsideration of Order No. 984, but any further relief was denied in Commission Order No. 1001 (unreported), which thus technically is also challenged by Transit at this time.

By its petition for review of the Commission's action, Transit assails Orders No. 984 and 1001 for two reasons. First, assertedly the Commission erred in declining to include within Transit's projected operating expenses for the future annual period during which the proposed fares were to apply,[2] an amount to cover increased wage and related expenses expected to result as a consequence of what Transit contended would be predictable increases in the cost-of-living index. Second, Transit suggests the Commission erred in setting Transit's fares at a level which, according to the Commission's own calculations, was designed to produce a net operating income of $1,590,340, after the Commission had previously determined that a somewhat higher return of $1,696,926 would be just and reasonable. These contentions will be treated separately.

## I. Labor Costs and the Cost-of-Living Index

At the time of the proceedings before the Commission leading up to Order No. 984, Transit's contract with the union which is the collective bargaining agent for the majority of Transit's employees included a clause which required automatic wage increases periodically whenever the cost-of-living index for Washington, D. C. rose. In its presentation in the hearings before the Commission, Transit introduced expert testimony as to what increases could be expected in the cost-of-living index during the future annual period to which the new fares, if approved by the Commission, would apply. The Commission, however, chose not to allow Transit to include within its projected operating expenses *any* amount to cover increased labor costs which might arise from changes in the cost-of-living index. Transit now seeks reversal of this holding of the Commission.

The underlying principle which governs the treatment of possible increased labor costs attributable to changes in a cost-of-living index is simple to state and not really in dispute.

---

1. The Compact is incorporated into Pub. L. 86–794, 74 Stat. 1031 (1960), and is set forth in full following D.C.Code § 1–1410 (1967). Amendments to the Compact appear as a part of Pub.L. 87–767,

76 Stat. 765 (1962), and are set forth following D.C.Code § 1–1410(a) (1967). All citations to the Compact are to Title II, Article XII.

2. July 1, 1969 to June 30, 1970.

Anticipated expenses of this character are properly to be taken into account whenever they can be predicted with reasonable accuracy. *See* Williams v. Washington Metropolitan Area Transit Commission, 134 U.S.App.D.C. 342, 394, 415 F.2d 922, 974 (en banc 1968), cert. denied, 393 U.S. 1081, 89 S.Ct. 860, 21 L.Ed.2d 773 (1969); *cf.* D. C. Transit System, Inc. v. Washington Metropolitan Area Transit Commission, 121 U.S.App. D.C. 375, 401, 350 F.2d 753, 779 (en banc 1965) (Transit I). Implicit in this principle is the realization that all such predictions involved in the process of ratemaking are necessarily imbued with "the uncertainty that attends all prophesy . . . ." Williams v. WMATC, *supra*, 134 U.S.App.D.C. at 393, 415 F.2d at 973. It is only where anticipated expenses of this type are "too remote or speculative to be forecast with any reasonable degree of certainty" that they are properly not to be considered. *Id.*, 134 U.S.App.D.C. at 394, 415 F.2d at 974.

■ It is not clear from the Commission's order that this principle was properly understood and applied. In Order No. 984, the Commission said:

> In recent times, and particularly during the last two years, the company has faced constant escalation of wages due to the cost-of-living clause. Therefore, we must consider very carefully the possibility that the additional cost-of-living wage adjustments forecast in Company Exhibit No. 3, in the amount of $169,960 *will, in fact, materialize* during the future annual period involved in this rate case. If we were to look only at past experience, we could be forced to conclude that these cost-of-living increases *will actually occur*. However, we are acutely aware that their *occurrence, vel non*, is dependent upon national and local economic conditions. (J.A. 11–12) (Emphasis supplied).

In Order No. 1001, the Commission added:

> We said in Order No. 984 that we would not allow those costs because of the difficulty in anticipating with any degree of certainty that those costs *would actually be incurred.* . . . Our refusal to allow future cost-of-living increases is based upon our total inability to predict what *will materialize.* We are not relying specifically upon the views of any public or private person as to what *will take place.* (J.A. 65–66) (Emphasis supplied).

The emphasized portions of these orders seem to imply that the Commission sought a greater degree of certainty in the estimates of the cost-of-living index than is required. In order to include these costs the Commission need not "conclude that these cost-of-living increases will actually occur," for as the Supreme Court has observed, "[t]here is left in every case a reasonable margin of fluctuation and uncertainty." Dayton Power & Light Co. v. Public Utilities Commission, 292 U.S. 290, 310, 54 S.Ct. 647, 657, 78 L.Ed. 1267 (1934).

Keeping in mind our doubts concerning the propriety of the standard applied by the Commission, we turn to the record and the Commission's order to ascertain whether there is substantial evidence from which the Commission might have concluded that these expenses were "too remote or speculative to be forecast with any reasonable degree of certainty." The record is not as helpful as it might have been; the thrust of Transit's expert testimony was largely to the effect that the index would in fact rise, with little testimony devoted to specific estimates or a discussion of the accuracy with which such changes could be predicted. But there are two wholly uncontradicted facts that stand out: (1) Transit's expert testified that, whatever the increase in the cost-of-living index might be, there was absolutely no chance that the index would fail to rise in some amount. J.A. 114; and (2) Transit's exhibit showing changes in the index for the preceding ten-year period revealed that, without exception, the index had

risen some amount in each of those years. J.A. 145.

■ The Commission countered this evidence in two ways. First, the problem was posed by the Commission in Order No. 984 as follows:

We are squarely presented, therefore, with the need to determine whether to continue our past policy of recognizing only those cost-of-living increases which are required by conditions as of the date of our order.

J.A. 11. With the problem thus framed, and presented with record evidence which, at the very least, casts doubt on the validity of that policy, the Commission in Order No. 1001 nonetheless referred to its "policy in the past . . . to disallow those costs" while ostensibly basing its refusal to allow these expenses on "our total inability to predict what will materialize." J.A. 65–66. We are not told what role the policy played in reaching that conclusion, nor are we told the result of the Commission's determination "whether to continue [the] past policy." The Commission cannot properly refuse to come to grips with this problem. With its prior policy squarely under attack, the Commission must either justify or disavow that policy. Justification there may be, but it does not appear, and without it the Commission must find support for its rejection of Transit's otherwise uncontradicted evidence elsewhere.

Official notice of extra-record materials provided the Commission with its other source of information with which to counter Transit's evidence. These materials included the widely divergent economic forecasts published in "[t]he newspapers, periodicals and journals coming to our attention on a daily basis," (J.A. 12) and the prevalent governmental aspirations to check the steadily accelerating inflation in the nation's economy. But neither divergent public forecasts nor the aspirations of important governmental decisionmakers necessarily lead to the conclusion that increases in the cost-of-living are too remote or speculative to be forecast with reasonable certainty. Divergent forecasts might result from considering various extremes of economic theory which are offset by a strong consensus among a significant segment of respected economists; and even aspiring decisionmakers are generally pressed by the responsibility of their positions to support their optimism with reasonably attainable economic objectives. But here again the Commission's orders are devoid of any explanation of the factual bases or the rationale for its conclusion that "to assume the continuation of an upward trend in the cost of living" would be to engage in an impermissible conjecture. J.A. 12.

■ In short, the Commission's treatment of the cost-of-living index question fails to measure up to its obligation either to make an intelligent estimate of a permissible item of expense, or to provide a factually supported reasonable explanation why such an estimate cannot be made. The Commission's orders in this regard are ambiguous as to the standard applied and as to the role played in the decision by a disputed policy. Their deliberations and conclusions on the matter fail to evidence the thoughtful inquiry and careful reasoning to a rational conclusion required of the Commission. Williams v. WMATC, *supra*, 134 U.S.App.D.C. at 380, 394, 415 F.2d at 960, 974. As to this aspect of Orders No. 984 and 1001, the Commission must be reversed and the case remanded for reconsideration in accordance with this opinion.

## II. *The Fare Schedule Established by the Commission*

After lengthy calculations based on the record made at the hearings, the Commission concluded that a net operating income to Transit of $1,696,926 would be just and reasonable. For purposes of deciding the present issue, that determination by the Commission is not questioned. However, the Commission

proceeded to establish a fare schedule which, by its own calculations, the Commission initially anticipated would produce a net operating income of only $1,590,340. Transit argues that the Commission was in error in not setting a fare schedule designed to return to Transit the full $1,696,926 in net operating income.

The Commission's approach in arriving at a new fare schedule, once it had determined what would be a just and reasonable net operating income, was one of trial and error. In Order No. 984, the Commission first calculated the net operating income which it was expected would result if the fares proposed by Transit, which incorporated a general three cent increase, were made effective, and arrived at a figure of $2,313,250. J.A. 39. This was concluded to exceed what was just and reasonable. As a next step, the Commission calculated the net operating income with a two cent increase in intra-District of Columbia, intra-Maryland, and all interstate trip fares, and a five cent increase in the Capital Hill express service. The result was a predicted net operating income of $1,541,984. J.A. 39. As the Commission noted, this indicated that a fare structure incorporating something between a general two cent and a general three cent increase was required. The Commission thus proposed an increase of two cents in intra-District of Columbia, intra-Maryland and interstate local service fares, coupled with an increase of five cents in both interstate express service and Capital Hill express service fares. The same calculation then gave a result of $1,590,340 in net operating income, which the Commission thought acceptable although it was still somewhat short of the $1,696,926 figure. J.A. 41.

In passing on the validity of the Commission's approach to setting fares, it must be remembered that the requirement is only a fare structure which will give Transit an *opportunity* to earn a just and reasonable net operating income. 1 A. Priest, Principles of Public

Utility Regulation 46 (1969). Further, there is nothing sacrosanct about the figure $1,696,926. It is itself only an approximation, and of course there need be no guarantee that net operating income will actually equal this amount. *See* Payne v. WMATC, 134 U.S.App.D.C. 321, at 330, 415 F.2d 901 at 920. The Commission is certainly not required to juggle around various combinations of fares until at length it arrives at a combination which it anticipates will produce exactly $1,696,926.

Perhaps the Commission could have, without undue further effort, arrived at a fare combination which would have returned to Transit something slightly in excess of $1,696,926. But at least in the context of the situation as it faced the Commission, neither was this obligatory. First, the Commission noted that its calculations of anticipated net operating income were based in part on certain very conservative estimates. Thus, the Commission thought it very possible that the net operating income actually achieved by Transit would somewhat exceed what the Commission calculated for any particular fare structure. The Commission's observance of the significance of this point is entirely consistent with the principle that fares need only be set so as to provide an *opportunity* for Transit to earn the just and reasonable dollar amount of net operating income. Second, the Commission indicated that if subsequent experience showed that Transit would *not* earn the just and reasonable amount, the Commission would be receptive to making up the deficit by a credit from a court-ordered reserve previously set up by Commission Order No. 981 (unreported). A similar approach by the Commission has previously received that approval of this court, *see Transit I, supra,* 121 U.S.App.D.C. at 389–390, 350 F.2d at 767–768, and no reason appears why that approach is not a reasonable one here.

The fare schedule established by the Commission thus provides Transit

with all that it is entitled to, and the Commission's reasoning in arriving at the schedule impresses us as being entirely rational. Orders No. 984 and 1001 are thus affirmed in this particular.

### III. *Disposition*

Our companion cases today set forth at ample length the relevant principles of restitution and the proper roles of the Commission and this court respectively. For reasons extensively detailed therein it is clear that there can be no retroactive ratemaking and that in light of the recent public takeover of Transit, the WMATC no longer has any prospective ratemaking authority anyway. Therefore the remedy in this case must operate on and in harmony with the restitutional remedies prescribed in those companion cases.

It would be an exercise in futility to require the Commission to place itself in the unrealistic hypothetical position of determining what, at the time Order No. 984 was issued, the Commission's estimate of the cost of living index increase would have been for the relevant period of time. Now we have the benefit of hindsight and it seems manifestly appropriate to make use thereof. Therefore, assuming that the Commission cannot come forward with a compelling justification for its policy as discussed in Part I, *supra,* the Commission is directed to compute the incremental amount Transit would have received during the time Order No. 984 was in effect, had it been allowed a fare increase in light of the increases in labor costs under the cost of living index escalation clause in its bargaining agreement. This amount should then be set off against whatever amounts that are determined to be necessary to restore to the farepayers through the equitable restitutional remedies mandated by today's companion cases. And, just as in those cases, our jurisdiction over this case is retained in full.

So ordered.