350 F.2d 753
 D. C. TRANSIT SYSTEM, INC., Petitioner,
v.
WASHINGTON METROPOLITAN AREA TRANSIT COMMISSION, Respondent, Alfred S. Trask and Richard A. Williams, United States of America, Intervenors.
Richard A. WILLIAMS and Alfred S. Trask, Petitioners,
v.
WASHINGTON METROPOLITAN AREA TRANSIT COMMISSION and
D. C. Transit System, Inc., Respondents, United States of America, Intervenor.
 No. 17953.
 No. 17954.
 United States Court of Appeals District of Columbia Circuit.
 Argued June 3, 1964.
 Decided April 8, 1965.
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Mr. Harvey M. Spear, Washington, D. C., with whom Messrs. John R. Sims, Jr., Edmund L. Jones and John J. Ross, Washington, D. C., were on the brief, for D. C. Transit System, Inc., petitioner in No. 17953 and respondent in No. 17954.
 
 1
 Mr. Leonard N. Bebchick, Washington, D. C., for Williams and Trask, petitioners in No. 17954 and intervenors in No. 17953.
 
 
 2
 Mr. Harold Leventhal, Washington, D. C., also entered an appearance for Williams and Trask.
 
 
 3
 Mr. Russell W. Cunningham, Arlington, Va., for respondent Washington Metropolitan Area Transit Commission.
 
 
 4
 Mr. I. Daniel Stewart, Jr., Atty., Dept. of Justice, of the bar of the Supreme Court of Utah, pro hac vice, by special leave of court, with whom Asst. Atty. Gen., William H. Orrick, Jr., and Mr. Lionel Kestenbaum, Atty., Dept. of Justice, were on the brief, for intervenor United States of America.
 
 
 5
 Before BAZELON, Chief Judge, WILBUR K. MILLER,* FAHY, WASHINGTON, DANAHER, BASTIAN,* BURGER, WRIGHT, and McGOWAN, Circuit Judges, sitting en banc.
 
 
 6
 McGOWAN, Circuit Judge, with whom BAZELON, Chief Judge, FAHY, WASHINGTON, DANAHER, BASTIAN,* BURGER, and WRIGHT, Circuit Judges, join:
 
 
 7
 On December 5, 1962, D.C. Transit System, Inc. (Transit), filed an application with the Washington Metropolitan Area Transit Commission (Commission), seeking authority to increase certain of its fares for transporting passengers within the District of Columbia and between the District and certain points in Maryland. Transit requested permission to raise the token fare from 20¢ to 25¢, while continuing the adult cash fare of 25¢. Transit's proposal would thus, in effect, have eliminated the use of tokens and established a single adult cash fare of 25¢. The principal reason advanced by Transit for its request was increased operating expenses brought on by a new three-year labor contract, which it asserted would add $1,201,416 to its labor costs in the calendar year 1963 and over $4,000,000 through 1965.
 
 
 8
 Pursuant to Section 6(a) of Article XII of the Washington Metropolitan Area Transit Regulation Compact, 74 Stat. 1031 (1960) (Compact), the Commission suspended Transit's proposed fares until April 13, 1963, and ordered public hearings on their lawfulness. Hearings were held intermittently between January 11, 1963, and March 12, 1963. Several individual transit riders, including petitioners in No. 17,954, civic organizations, and the General Services Administration, were permitted to participate in the proceedings before the Commission and given an opportunity to present evidence. Upon completion of the hearings, the Commission, in its Order No. 245 of April 12, 1963, ruled that Transit's existing fares were inadequate to provide a fair return, but it also found that Transit's proposed increase would be "unjust and unreasonable" because it would "produce net revenues in excess of [its] * * * financial requirements." Instead, the Commission authorized, effective April 14, 1963, an increase in the token fare from 20¢ each, sold in units of five for $1.00, to 21¼¢ each, sold in units of four for 85¢. The Commission found that this increase, together with Transit's other fares,[1] would during the test period[2] provide Transit with net operating income of $1,480,746 and an operating ratio of 95.13.[3]
 
 
 9
 The Commission denied Transit's petition for reconsideration of its April 12 order on April 15, 1963; that of the General Services Administration on April 29; and that of petitioners Williams and Trask on May 2. The same day its petition for reconsideration was denied, Transit filed a petition to review the Commission's order in the United States Court of Appeals for the Fourth Circuit.[4] Petitioners Williams and Trask filed a petition for review in this court on May 22, 1963, and another in the Fourth Circuit two weeks later. Subsequently, the United States and petitioners Williams and Trask successfully moved in the Fourth Circuit to transfer both cases to this court. We granted the United States leave to intervene in both cases.
 
 
 10
 Both Transit and petitioners Williams and Trask challenge the fare increase ordered by the Commission, Transit urging that it is inadequate, and Williams and Trask claiming it is excessive. They also, as does the United States, dispute certain findings made and conclusions reached by the Commission in arriving at its ultimate ruling. We proceed first to consider certain issues raised by Transit in its appeal in No. 17,953, and thereafter certain contentions variously made by the petitioners and the intervenor in No. 17,954. An issue common to both appeals, i. e., the allowance of a return of 4.87 per cent on operating expenses, is taken up last, although its importance is manifest from the fact that it occasions the remand that we make of this case to the Commission.
 
 No. 17,953
 
 11
 
 1. Transit's Claim to a Minimum Guaranteed Return.
 
 
 
 12
 Transit's principal contention on this appeal is that the Commission should have ruled that, as a matter of law, Transit is entitled to have its fares set at a level calculated to bring a return of 6.5 per cent, net after all taxes, on its gross operating revenues, i. e., an operating ratio of 93.5. It relies on language in Section 4 of the D. C. Transit Franchise Act, 70 Stat. 598 (1956) (Franchise Act), and in Section 6(a) (4) of the Compact. The former reads as follows:
 
 
 13
 "It is hereby declared as a matter of legislative policy that in order to assure the Washington Metropolitan Area of an adequate transportation system operating as a private enterprise, the Corporation, in accordance with standards and rules prescribed by the Commission,[5] should be afforded the opportunity of earning such return as to make the Corporation an attractive investment to private investors. As an incident thereto the Congress finds that the opportunity to earn a return of at least 6½ per centum net after all taxes properly chargeable to transportation operations, including but not limited to income taxes, on either the system rate base or on gross operating revenues would not be unreasonable, and that the Commission should encourage and facilitate the shifting to such gross operating revenue base as promptly as possible and as conditions warrant; and if conditions warrant not later than August 15, 1958. * * *"
 
 
 14
 Section 6(a) (4) contains strikingly similar language:
 
 
 15
 "It is hereby declared as a matter of legislative policy that in order to assure the Metropolitan District of an adequate transportation system operating as private enterprises the carriers therein, in accordance with standards and rules prescribed by the Commission, should be afforded the opportunity of earning such return as to make the carriers attractive investments to private investors. As an incident thereto, the opportunity to earn a return of at least 6½ per centum net after all taxes properly chargeable to transportation operations, including but not limited to income taxes, on gross operating revenues, shall not be considered unreasonable."
 
 
 16
 Transit relies as well on Section 9 of the Franchise Act set forth in the margin,[6] which in substance provides that Transit will not be liable for the local motor vehicle fuel tax on fuel purchased during the course of the year unless and until it has earned a return of 6.5 per cent on its applicable rate base. Unless Sections 4 and 6(a) (4) are read as making a 6.5 per cent return on gross operating revenues a mandatory minimum, Transit argues, the exemption from local taxes contained in Section 9 makes no sense. Finally, Transit recites at some length the history of Congress' deliberations when it was considering and enacting the Franchise Act.
 
 
 17
 This history indisputably evidences a Congressional concern that mass transportation in the District of Columbia remain in private ownership, and a Congressional recognition that substantial inducements would have to be offered to private investors if that purpose were to be realized. And there is no doubt that many of the provisions included in the Franchise Act represented concessions or assurances to Transit's owners. It is Transit's contention, however, that Section 4 in particular was intended by Congress to be a guarantee that fares would be fixed at a level that would provide a return of at least 6.5 per cent on gross operating revenues. Transit's construction presents a serious issue which is by no means lacking in plausibility, but both logic and the relevant legislative history compel us to reject it.
 
 
 18
 The operating ratio method of rate-making was adopted by the Interstate Commerce Commission during World War II to determine the rates of interstate motor carriers.[7] This method was thought to provide a fairer test of revenue needs in an industry in which, characteristically, a carrier's capital investment is small in comparison to his total costs. Among motor carriers, annual operating expenses are often three or four times as great as investment in property.[8] The principal risk in such operations inheres in the cost of operation, not in the investment. Accordingly, the operating ratio method permits a carrier to earn an amount representing annual operating costs, plus an additional amount from which to pay interest to the creditors and dividends to the owners. A carrier's operating ratio is commonly expressed as the ratio of expenses to gross revenues — a figure usually between 90 and 100. The amount earned over and above operating expenses, however, can also be stated as a return, generally in the neighborhood of 1.0 to 10.0 per cent, on gross revenues. This, it would appear, is how Congress decided to give content to the "not unreasonable" standard in Section 4 of the Franchise Act and Section 6(a) (4) of the Compact.
 
 
 19
 Because the operating ratio method is conceived for industries in which annual operating costs are generally much greater than investment in property, obviously a return of 6.5 per cent on such an enterprise's gross operating revenues is considerably greater than a return of 6.5 per cent on its "system rate base," i. e., its investment. Indeed, it was the inevitable inadequacy[9] of returns based on investment that in the motor carrier industry prompted the adoption of the operating ratio formula. That the same percentage rate can represent significantly different results in terms of actual revenue as applied to the same enterprise depending on which formula is used is evident in the case of Transit itself. Based on the Commission's own projection of Transit's "total operating revenue deductions" (expenses) for 1963 of $28,939,892, a return of 6.5 per cent would represent gross operating revenues of about $30,952,290 and net operating income of roughly $2,012,400. A return of 6.5 per cent on its "system rate base" of, approximately, $20,000,00[10] would represent gross revenues of $30,250,000 and net operating income of roughly $1,300,000, or about $700,000 less for the creditors and investors. Yet Congress, in Section 4 of the Franchise Act, authorized the Public Utilities Commission to use either method in setting the company's fares, though it urged the early adoption of the operating ratio standard. Thus, if Section 4 is to be read as prescribing a minimum guaranteed return of 6.5 per cent, as Transit insists it must, it could be satisfied by either of two inevitably and substantially different results. In effect, Transit would have us hold that Congress initially established alternative measures of the minimum return. We have found no evidence that Congress thought it was doing so, and we think it highly unlikely that it intended to allow the size of Transit's return to depend on the promptness with which the PUC shifted to the operating ratio formula. It is in the light of this seeming anomaly that we proceed to examine the history of Section 4's enactment.
 
 
 20
 As introduced, neither S. 3073, which in amended version became the D.C. Transit Franchise Act, nor its House counterpart, H.R. 8901, contained language with respect to one formula or the other.[11] Indeed, since both provided for the establishment of a publicly-owned transit authority, neither mentioned rate of return at all. The problem emerged for the first time in an amendment in the form of a substitute for H.R. 8901 proposed by the House Committee on Interstate and Foreign Commerce, following the Senate's passage of S. 3073. This amendment would have permitted Capital Transit Co., Transit's predecessor, to continue to provide mass transportation in the District of Columbia. A "system rate base for ratemaking purposes" would have been "specifically fixed" for the company, and, in the words of a member of the committee, "a 6½ percent return on the system rate base * * * [was to] be recognized as fair and reasonable."[12] The amendment contained no reference to any other standard of ratemaking. This omission, however, was not the result of legislative inattention. Representative Harris, Chairman of the subcommittee of the Committee on Interstate and Foreign Commerce that had prepared the substitute version of H. R. 8901, observed on the floor of the House that the Commissioners of the District of Columbia had been prepared to offer one applicant for the transit franchise "a rate of return based upon a 93½ percent operating ratio"; he recognized that "the 6½ percent of return on the rate base as herein provided would net any company substantially less over a period of years than the 6½ percent of revenues which the Commissioners were prepared to recommend."[13] This language strongly suggests that at least the original authors of the 6.5 per cent provision thought a return of 6.5 per cent on gross operating revenues would be too high.
 
 
 21
 Authority for the PUC to fix rates on the basis of the company's operating revenues, as an alternative standard, first appeared in the Conference substitute for S. 3073, which contemplated service by an entirely new enterprise, namely, D.C. Transit. The language is identical with that of Section 4 as enacted.[14] As Representative Harris explained,[15] the reference to the eventual use of the operating ratio method was added for two reasons. Transit was to acquire Capital Transit's properties for much less than the figure at which they were carried on Capital's books. In addition, Transit would promise to convert to an all-bus operation within seven years. In adding the alternative standard, the authors of the Franchise Act do not appear to have been seeking simply to add to the inducements offered in the House version. Rather, they seem to have believed that the operating ratio method would in the long run provide a fairer test of the rates of the kind of operation Transit proposed,[16] and therefore sought to assure the company that that standard would eventually be adopted. Of course they may well have hoped that this assurance would encourage Transit to commit itself to provide an all-bus system, but this is a far cry from saying that Congress intended to guarantee Transit that its fares would invariably be fixed so as to ensure a return of at least 6.5 per cent. It seems highly improbable that those who, like Representative Harris, had so recently rejected a 6.5 per cent return on operating revenues as excessive, would enthusiastically endorse a proposal that would make such a return not merely likely, but mandatory.
 
 
 22
 We think the more likely explanation is that Congress initially used the figure of 6.5 per cent to inform the PUC that Capital Transit should be allowed a substantially greater return than it had been receiving.[17] It was logical that its return should continue to be based, as it had always been, on its "system rate base," i. e., its investment. When Transit came along with an offer to buy Capital's properties at less than half their book value, as well as a promise eventually to provide an all-bus system, it became clear that, certainly in the long run, the old rate-base formula would be inadequate. So Congress added language permitting the PUC to shift to the more appropriate standard, again using the figure of 6.5 per cent to indicate that it wanted Transit to do better than its predecessor had been doing. The PUC was given some latitude in deciding when to shift from the old rate-making formula to the new,[18] undoubtedly so that it could take into account Transit's progress toward conversion. In short, Congress seems to have been trying to ensure that Transit would enjoy, after acquiring Capital's facilities at a discount and converting to a low investment-high cost bus operation, as good treatment as it had been prepared to give Capital.
 
 
 23
 Our reading of the legislative history is consistent with subsequent administrative and legislative construction of the language of Section 4. In two of the rate proceedings conducted by the Public Utilities Commission before jurisdiction over Transit's operations was transferred to the Washington Metropolitan Area Transit Commission, the company was allowed returns of 4.10 and 4.92 per cent on its gross operating revenues.[19] In neither instance did Transit feel itself sufficiently aggrieved or betrayed to press to judicial resolution its claim that Section 4 guaranteed it the opportunity to earn 6.5 per cent.[20] We do not suggest that Transit is now barred from presenting its argument, but we cite its previous quiescence only as some evidence that the PUC's construction was not entirely unexpected to the company itself.
 
 
 24
 Nor did it come as a surprise to Congress. In 1962, Congress amended 44 D. C.Code § 214a, which provides in substance that if, in any year, Transit fails to earn the return allowed in its most recent rate proceeding, it will be eligible to receive from the District of Columbia a subsidy based on the number of school children carried during the year at half fare.[21] In no event can this subsidy exceed the amount by which the company has fallen short of the allowed return. As originally introduced,[22] the bill that became the basis for Section 214a provided that Transit would receive a subsidy in the amount of the difference between its actual net revenues and 6.5 per cent of its gross operating revenues. As reported to the House, and as enacted by Congress, the bill was amended to make the subsidy available only if the company failed to earn "the rate of return established by the regulatory commission having jurisdiction in such carrier's last rate case * * * on its gross operating revenues in the District of Columbia * * *." The reference to a 6.5 per cent return was apparently deleted at the urging of the District Commissioners.[23] Significantly, Section 214a was enacted after the PUC had twice fixed Transit's fares to allow a return of substantially less than 6.5 per cent on gross operating revenues. But even more significant in this regard, both houses of Congress were well aware that the PUC had refused to regard Section 4 as establishing a statutory minimum rate of return. Indeed, Representative Broyhill, a sponsor of the school fare subsidy and then a member of the House District of Columbia Committee, on the floor of the House described the PUC's application of that provision:
 
 
 25
 "The District of Columbia Public Utilities Commission accordingly established a ceiling of 6.5 percent on the system rate basis [sic] as the maximum allowable net earnings for the company. In March of 1960, the Commission converted this formula to 4.92 percent of the company's gross revenues on operations in the city; which figure was designed to keep the company's net earnings at about the same level."[24]
 
 
 26
 Nowhere in the reports of the committees of either chamber, or in the debates regarding Section 214a, does there appear any suggestion that Congress regarded the PUC's refusal to allow Transit to earn 6.5 per cent on its gross operating revenues as a violation of its "mandate." To the contrary, Congress's enactment of that provision, after deleting the reference to a specific rate of return, signifies approval of the PUC's construction.[25]
 
 
 27
 We do not regard the enactment of Section 6(a)(4) of the Compact, which speaks only of a 6.5 per cent return on gross operating revenues, as undermining the foregoing construction of Section 4. The reason for omitting any reference to Transit's system rate base is not difficult to discern; the PUC had, as Congress had urged, already shifted to the more modern rate-making standard. And the legislative history of the Compact itself reveals why, in every other respect, Congress used the same language as it had used in Section 4. Section 6(a)(4) was intended not only to reaffirm but to reenact Section 4.[26] The meaning of both provisions, therefore, must properly be sought in the legislative history of the latter. Moreover, Section 6(a)(4) of the Compact, like the school fare subsidy provision, was enacted after the Public Utilities Commission's 1960 rate order limiting Transit, for the second time,[27] to a return of less than 6.5 per cent on gross operating revenues.
 
 
 28
 As we have indicated, however, Transit relies on more than simply the "plain" language of Section 4 and Section 6(a)(4). Section 9 of the Franchise Act, exempting the company from the District of Columbia tax on motor fuel unless it earns a return of 6.5 per cent on its rate base or operating revenues, makes no sense, Transit argues, unless Section 4 is read as prescribing a minimum rate of return.[28] In its original form, the proposed Section 9 referred only to the return on the company's system rate base. The reference to a return based on operating revenues was inserted in the Senate-House Conference version of S. 3073 at the same time Section 4 was changed to permit the PUC to adopt the latter standard. Congress no doubt intended that the same method should be used to determine whether Transit was liable for fuel taxes as had been used to fix its rates. It does not seem either improbable or shockingly inconsistent that Congress in Section 9 should have established a fixed criterion of the availability of the motor fuel tax exemption, yet not have intended Section 4 to be a guarantee to Transit of the opportunity to earn a minimum return. As written, Section 9 provides a concession, the availability and amount of which is not to be determined until the end of Transit's operating year. The required inquiry has none of the judgmental character that epitomizes the process of setting rates in the first instance, and, quite understandably, Section 9 says nothing about "reasonableness," or any other criteria the PUC was to consider.[29] It is true that Congress generally seems to have associated the matter of inducements with the recurring figure of 6.5 per cent. But it does not follow that, because it was prepared to make that figure the standard of the availability of an annual subsidy in the form of exemption from motor fuel taxes, it must therefore be taken to have intended to limit the discretion of the Commission in fixing just and reasonable fares by guaranteeing a 6.5 per cent minimum.
 
 
 29
 Finally, Transit argues that the legislative history of the Franchise Act reveals a clear Congressional desire to make the new transit company attractive to private investors, and a complementary concern that mass transportation in the District of Columbia remain in private hands. Our reading, and the PUC's, of Section 4 is not inconsistent with this legislative purpose, as an examination of the company's recent financial history reveals. During the six years prior to Transit's commencement of operations,[30] its predecessor, Capital Transit, saw its annual net income decline from 5.7 per cent of its rate base of over $28 million in 1950, to 3.5 per cent of a rate base of nearly $24 million in 1954, and to a net operating deficit of $1.5 million in 1955. In the five years after Transit undertook to provide mass transportation for the District, the company's return increased from 5.3 to 7.1 per cent of its original cost rate base, and from 7.4 to 8.1 per cent of its rate base as computed by the PUC. During this same period its original cost rate base grew from $17.4 million to $20.0 million. In April of 1962, a representative of the company, testifying before the House District of Columbia Committee on the proposed school fare subsidy, stated that Transit was then earning a return of about 4.9 per cent on its gross operating revenues of over $28.0 million.[31] On these facts, it can hardly be said that Transit has not become a profitable, attractive enterprise under the regulatory scheme envisaged in 1956.
 
 
 30
 In holding that Section 4 of the Franchise Act does not guarantee Transit a minimum of 6.5 per cent on Transit's gross operating revenues, we do not intend to imply that it establishes a minimum "just and reasonable" return of 6.5 per cent on the company's rate base, or the equivalent return in dollars on its gross operating revenues.[32] The language of Section 4, we think, is susceptible of another reading. The Commission, by virtue of Section 6(a) (3) of the Compact, is obligated to set for the carriers over which it has jurisdiction "just and reasonable fares" — a standard which has invariably imposed an obligation to balance the interests of both the utility and the consumers. In this setting, the deceptively specific language of Section 4 and Section 6(a) (4) should not be read as depriving the Commission of that discretion which is a customary, and necessary, element of rate-making. We think Congress used the figure of 6.5 per cent simply to suggest a general objective of this regulatory scheme — to allow Transit a higher return than its predecessor had received. It clearly seems to have intended that the rate-making authority should look to other criteria as well.[33] Certainly this was the understanding, and the practice, of the PUC, as it was, in this case, of the Washington Metropolitan Area Transit Commission. The former consistently took the position that it possessed authority to set Transit's rates at whatever level it found to be "just and reasonable" — high enough to insure that the company's capital requirements would be met, and low enough to enable it to continue to attract and retain patrons. On three different occasions the Commission found this level to be below what Transit now claims is the statutory minimum. Both the PUC's position and its performance were matters of public record, and well known to Congress, when the Compact was enacted with the purpose of continuing the rate-making formula already in use. Congress was similarly and explicitly aware of the PUC's interpretation when it adopted the school fare subsidy provision in 1962 but only after deleting the reference to a specific rate of return. We find this history compelling evidence of how Congress intended the rate provisions of the Franchise Act and the Compact were to operate.
 
 
 31
 
 2. The Suspension of Accruals for Track Removal.
 
 
 
 32
 Transit also attacks the portion of the Commission's order denying its motion to spread accruals to its reserve for track removal over the remaining life of its franchise, and directing that no further accruals be made for the time being. Section 7 of the Franchise Act, set forth in the margin,[34] required Transit to remove its tracks and repave the streets as part of its undertaking to convert to an all-bus operation. Pursuant to the understanding underlying this provision, the PUC estimated the total cost of the removal and repaving program at $10,441,958, and ordered and setting up of a reserve for track removal to be credited from the company's gross annual revenues at the rate of $1,044,196 a year for ten years, such annual accruals to constitute charges against operating expenses. The Commission, however, found that, as of December 31, 1962, accruals would total $6,656,748.22, while net charges against the reserve would amount to $1,842,499.10, leaving an excess of $4,814,249.12. Mr. Harold L. Aitken, Director of the District of Columbia Department of Highways and Traffic, testified that the cost of the track removal program, through June 30, 1965, would be $4,143,228, that beyond that date there were no plans for further removal or repaving, and that the new pavement would be structurally adequate for fifteen to twenty years. On this evidence the Commission concluded that the balance in the track removal reserve would cover "the reasonably anticipated demands upon it for the immediate future." It therefore ordered that the annual accruals be suspended as of January 1, 1963.
 
 
 33
 The sources of Transit's dissatisfaction with the Commission's action are two. Primarily, it claims that, because its obligation under Section 7 of the Franchise Act is definite and unavoidable, it should be permitted to continue to accumulate a reserve sufficient to defray what it may ultimately have to spend in the light of the Public Utilities Commission's estimate. Secondarily, Transit contests the estimate of the cost of the Highway Department's program to pave over abandoned track, on which the Commission relied in evaluating the adequacy of the company's existing reserve. Neither claim persuades us that the Commission's action should be upset.
 
 
 34
 The PUC's initial estimate of the eventual cost of Transit's undertaking was never intended, or understood, to be immutable. Certainly Transit would have been justified in seeking help if the estimate had immediately proved inadequate, and expenditures were exceeding the annual accruals. We do not quarrel with the company's contention that, as of now, its long-run obligation to remove the tracks remains unchanged, whatever the likelihood that it may eventually be reduced or cancelled. But more to the point is the Commission's finding, which we regard as based on substantial evidence,[35] that Transit's immediately foreseeable expenses will not exceed its existing reserve. We have recently had occasion to reverse an order of the PUC granting Transit's application for a fare increase because it had failed to take into account probable economies that the company would enjoy by coordinating its track removal program with the District's street repaving plans, at a time when the company's existing reserve would have covered the costs of removal "well into the future."[36] We note, moreover, that the Commission promised to "keep abreast of the track removal and repaving program of the District of Columbia and if, at any time, because of a change in the program, there appears to be a need for resumption of accruals to this reserve, [to] * * * act accordingly." Thus, neither the Commission nor we have foreclosed Transit, should it in fact incur expenses for track removal in excess of existing reserves at some time in the future, from seeking to recover such excess from the users of its service.
 
 
 35
 
 3. The Acquisition Adjustment Account.
 
 
 
 36
 Transit finds error as well in the Commission's treatment of a proposal for dealing with its Acquisition Adjustment Account. This account represents the difference between the net original cost to Capital Transit, Transit's predecessor, and the price Transit paid for the properties it acquired from Capital. Totalling $10,339,041.19, it was set up by the PUC in 1957, to be amortized over a ten-year period by credits to operating expenses in the amount of $1,033,904.12 annually. Transit sought to amortize the remaining balance of the account over the remaining life of its franchise — the same period over which it proposed to accrue the balance of the track removal reserve. Transit argued before the Commission, as it argues here, that the two accounts were and are "directly interrelated," and that the treatment accorded the former should take into account the treatment of the latter. Its point seems to be that, having suspended accruals to the track removal reserve, the Commission should have accorded the same treatment to the Acquisition Adjustment Account — presumably by suspending the annual $1,033,904.12 credit against depreciation charges. The Commission recognized the interrelationship, albeit circumstantial, that existed between the two accounts when they were set up, and it resolved, in light of its decision to suspend accruals to the track removal reserve, to "re-examine the amortization period for the Acquisition Adjustment." Such a re-examination would require relating "the Acquisition Adjustment balance to the properties acquired on August 15, 1956, which are still in service and subject to depreciation at original cost," and since the Commission found the record before it inadequate for that purpose, it left the record open for the presentation of additional evidence on the issue. Meanwhile it ordered that amortization of the Acquisition Adjustment Account remain unchanged "until adequate evidence supporting a different rate is presented to the Commission."
 
 
 37
 On this record we are unable to say that in so doing the Commission committed error. Indeed, its course of action seems to us to be most sensible. It is undoubtedly true, as the Commission recognized, that the PUC's treatment of the two accounts assumed their interrelationship. But it is quite another thing to say that they are so inextricably tied together as to require identical treatment throughout the life of Transit's franchise. The Acquisition Adjustment Account reflects a savings realized when Transit purchased Capital Transit's properties. The amount of that savings depended on the accuracy of the PUC's initial estimate of the useful life of those properties — an estimate the new Commission has impliedly agreed to re-examine. The reserve for track removal and repaving likewise represents an estimate — an estimate of the cost to Transit, of removing from the public streets the remnants of its predecessor's rail operation. The fact that these two estimates were almost identical in 1956 made it appropriate for the PUC to fix the same period for, respectively, the amortization of the company's Acquisition Adjustment and the accrual of a track removal reserve.[37] But neither this coincidence, nor the PUC's initial treatment of the two accounts, obligated it or its regulatory successor to continue to treat the two identically even though subsequent events eroded the bases of the original estimates. We are confident that Transit would not have so argued had its track removal and street repaving obligations rapidly outpaced its accruals for those purposes, while the properties it acquired from Capital Transit immediately revealed themselves to be substantially less durable than either the PUC, or Capital, had originally anticipated.
 
 No. 17,954
 
 38
 
 1. The School Fare Subsidy Issue.
 
 
 
 39
 In 1962 Congress amended Section 214a of Title 44 of the District of Columbia Code, hereinafter referred to as the School Fare Subsidy. This provision, which is set forth in the margin,[38] provides essentially that if Transit in any year earns less, on its District of Columbia operations, than the return fixed by the Commission in the company's last rate case, it shall be entitled to receive an amount equal to such difference, but no more than an amount equal to 10¢ for each school child who rode the company's buses at reduced fares. The parties are agreed that the District is under no obligation to pay anything unless and until the Commission certifies that the company has earned less than the allowed return on its local operations. They do, however, strongly disagree over whether the Commission is obligated to take into account this potential source of revenue in reviewing the company's proposed fares.
 
 
 40
 The Commission took the position that Section 214a is "a type of after-the-fact remedy available to provide additional compensation to the carrier in the event the Commission overstated the net revenue projections, resulting in the carrier not making a fair return."[39] It therefore refused to consider, as petitioners had urged, possible subsidy payments in determining the company's available revenues, opining that to do so would vitiate "the basic purpose of the legislation." Its reading of the statute, the Commission concluded, was supported not only by the language but by a recognition of what Congress intended. Transit is entitled to a subsidy only if its earnings on its operations within the District fall below the return allowed by the Commission on its system-wide operations. The computation of Transit's local revenues and expenses at the close of its operating year, as the statute contemplates, "would present a laborious task; to undertake such a feat prospectively would be an impossibility." The implication the Commission drew was that Congress could not have intended to impose such a burden.
 
 
 41
 Petitioners and the intervenor argue that the Commission's construction of Section 214a mistakes Congress' purpose in enacting the statute and frustrates the achievement of the two objectives Congress had in mind: (1) to shift the cost of transporting school children in the District from the adult riders of the transit system to the District taxpayers; and (2) to forestall requests for new rate increases. Because the Commission failed to consider possible subsidy income in appraising the company's fares, according to petitioners, the subsidy will be paid only if, and only to the extent that, its predictions of the company's other revenues are inaccurate. And, similarly, since the Commission's examination is confined initially to potential revenues exclusive of any subsidy, the company will be entitled to ask for a fare increase whenever its other sources of revenue promise to be insufficient to provide a fair and adequate return. Indeed, petitioners claim, it was because the Commission refused to take the subsidy into account in this case that it found a fare increase was necessary. On the basis of the previous year's figures, Transit could have received a subsidy of up to $544,000, since it carried nearly 5,440,000 school children at the reduced fare during that period. The Commission found that Transit's existing fares, exclusive of any subsidy, would leave it about $543,000 short of a "fair and reasonable" return, and therefore granted a fare increase.
 
 
 42
 Petitioners' arguments are not without weight, but we think the Commission has correctly divined and given effect to the understanding and intention of Congress. On its face, the language of Section 214a suggests that the relief therein provided was to be available only if Transit's District operations failed to produce the return already authorized by the Commission. The statute does not require the Commission to do anything — except, perhaps, to examine the company's earnings statement at the end of the year — unless the company's local income falls short of the return it previously determined to be "fair and reasonable."
 
 
 43
 Moreover, Congress' opposition to any proposal that would entail the expenditure of substantial amounts of public funds pervades the legislative history of Section 214a. Petitioners' reading of the statute, we recognize, would not guarantee Transit payment of all of the available subsidy. Even if the Commission considered subsidy income in fixing Transit's rates, it would be available and payable only if the company's other revenues fell short of the permitted return, and the Commission might underestimate such revenues. But petitioners' construction would make payment of the full subsidy far more likely, and indeed, under present conditions, almost inevitable. Transit would receive no subsidy only if the Commission substantially underestimated Transit's other revenues. In other words, the cost to the taxpayers would decrease as Commission error grew.
 
 
 44
 This anomalous result would contrast sharply with what Congress seems to have intended. The record of the hearings on Section 214a before the House District of Columbia Committee reveals that the House bill was changed, as was the final version, at the request of the D. C. Board of Commissioners, by deleting a reference to a 6.5 per cent return and inserting, "the rate of return established by the regulatory commission having jurisdiction in such carrier's last rate case." If the Board's recommendation were adopted, President Tobriner wrote, "since rates are fixed so as to provide the return allowed, there would be no reason to expect a substantial school fare subsidy."[40] Virtually identical language appears in the report of the Senate District of Columbia Committee, which accompanied the bill that eventually became Section 214a, in the course of the committee's discussion of the "annual cost" of the subsidy.[41] And on the floor of the Senate, Senator Morse, who sponsored the bill, described its operation in terms strongly suggesting that he expected the annual cost would be small:
 
 
 45
 "With the committee recommending that the amount to be paid in subsidy to the carriers should be governed by the rate of return established by the appropriate regulatory agency in the carriers' last rate case, there would be no reason to expect a substantial school fare subsidy since rates are fixed so as to provide the return allowed. * *[42]
 
 
 46
 If the Commission were to take subsidy payments into account in establishing the company's fares, there would, in contrast, be every reason to expect a substantial subsidy payment.
 
 
 47
 Such evidence is not confined, as petitioners suggest, to a single and possibly inadvertent sentence in the Senate Report. The House Report, in describing the operation of Section 214a, took as an example the year ending August 31, 1961, when Transit's allowed return was 4.92 per cent. Transit's net operating income for the year was $1,379,507 — some $60,000 short of 4.92 per cent of its gross operating revenues. "Hence, the difference between these two figures, or the maximum net amount by which the company could have been subsidized for that year had the provisions of S. 1745 then been in effect, is $60,269."[43] Transit's rate of return, of course, had been, and in the report's example apparently would have been, arrived at without consideration being given to any possible subsidy payment. On the floor of the House, Congressman Broyhill, a member of the District of Columbia Committee and one of the bill's sponsors, used the same example in assessing the cost of the legislation.[44]
 
 
 48
 The difficulty of differentiating, in advance, between the company's expenses and earnings respecting its operations within the District and those connected with its operations without, is, as the Commission pointed out, one not lightly to be summoned into being. Even more significant, we think, is the absence of any guidance as to how the Commission should take the subsidy into account in establishing Transit's fares, as it is assertedly obligated to do. How large a subsidy should it allow for? The maximum, that is, ten cents for every school child likely to ride the bus? If fares were fixed on this basis, Transit would run the same risk that its return would prove inadequate as it would if no subsidy were available. Moreover, any subsidy payment pursuant to Section 214a is subject to federal and District income and franchise taxes, both of which are to be treated as legitimate operating expenses under Section 6(a) (4) of the Compact. Presumably the Commission would be put to the task of estimating the potential tax liability on any subsidy payment it considered in setting the company's fares. Petitioners in their brief recognize the problems their construction of the statute would create, and they concede that "WMAT should perhaps recognize somewhat less than the full amount of the available subsidy and leave a cushion to guard against any unforeseen contingencies."[45] These problems by themselves would not, of course, justify the Commission's refusal to take the subsidy into account in setting Transit's fares if Congress had clearly intended it to do so. But Congress' intent seems to have been otherwise.
 
 
 49
 We recognize that in passing the School Fare Subsidy Congress expressed the desire that, so far as possible, the cost of transporting school children should be borne by the community at large and the hope that the subsidy would minimize the company's need for a fare increase, but we think the Commission's construction of Section 214a achieves the balance Congress intended between those objectives and its desire to insure the company's rate of return at as low a cost as possible. Under the Commission's reading of the statute, the cost of transporting school children will be borne by the taxpayers if and to the extent the Commission underestimates Transit's expenses or overestimates its revenues, neither of which is unlikely. The availability of the subsidy to make up any income shortage at the end of the year should reduce Transit's need to apply for a fare increase on the expectation that its existing fares may fail to yield the allowed return. Similarly, the Commission may properly be less inclined to grant what might prove to be a premature fare increase, knowing that the company is protected by the subsidy. Moreover, the Commission's construction makes the amount of the subsidy depend on the accuracy, rather than the inaccuracy, of its predictions of Transit's revenues and expenses.
 
 
 50
 
 2. The Depreciation Allowance for Abandoned Rail Facilities.
 
 
 
 51
 An item of $693,870 is challenged by both the petitioners and the intervenor. It represents an allowance for 7½ months of the future test period of a monthly depreciation charge of $92,516[46] for rail facilities abandoned prior to January 3, 1960. In Bebchick we noted that the Public Utilities Commission had decided to allow substantially less than Transit had claimed in respect of recoupment for unamortized rail facilities, but, even as to this lesser amount, we were of the opinion that the Commission had not exhibited adequate awareness of the standards set forth in Washington Gas Light Co. v. Baker, 88 U.S. App.D.C. 115, 188 F.2d 11 (1950), cert. denied, 340 U.S. 952, 71 S.Ct. 571, 95 L.Ed. 686 (1951), for measuring the propriety of allowances for abandoned property; and we said that in any new order these requirements should be met. Our reference to Baker meant that no allowance could be made for abandoned property unless the Commission first determined that the ratepayers had not already provided compensation through the inclusion of obsolescence in either (1) the make-up of the depreciation charge or (2) the fixing of the rate of return.
 
 
 52
 The Commission has now explored both these matters in detail and has found that the riders have not paid for the abandoned rail equipment through either increased rates of depreciation or an inflated rate of return. The United States, as intervenor, explicitly accepts these findings without objection; and we believe this position is justified. A full inquiry was made into these matters during the hearings before the Commission, and we find no warrant to disturb its conclusions regarding them.[47]
 
 
 53
 The intervenor does, however, urge, in common with petitioners, three other reasons why the $693,870 allowance should be eliminated. The first of these rests upon a variant of one of the Baker requirements. It is the claim that the rate of return in the past has in fact — if not in form — been increased to recoup obsolescence by artificially expanding the rate base to achieve this end; and the intervenor suggests a remand to permit the Commission to determine the precise extent of recoupment hitherto accomplished by this indirect means. We see no occasion to do so.
 
 
 54
 The contention essentially is that the so-called compromise rate base was adopted by the Public Utilities Commission back in 1957 for the very purpose of enabling Transit to recover the unamortized cost of rail facilities, and that that purpose must now be regarded as having been achieved. Our own review of Transit's rate base history does not compel this conclusion.[48] Transit began operations on August 15, 1956. Capital Transit's closing balance sheet on the day before showed the rate base properties to have a value of nearly $19,000,000. This is without deduction of the special reserves of approximately $10,300,000 set up on that balance sheet, which reserves were reflected in the lower purchase price paid by Transit for these properties. It is of interest to note that, just a week earlier on August 8, 1956, the PUC had, upon the remand of a pending 1955 rate case, fixed a rate base value, apparently speaking as of the earlier date, of about $23,000,000. This valuation was based upon the historical cost — original cost less accrued depreciation — of the properties belonging to Capital Transit. By express direction of Congress, Transit started its operating life with the same rate schedules as those fixed for its predecessor by reference to this rate base.[49]
 
 
 55
 In 1957 the PUC for the first time addressed itself to the valuation of these properties in Transit's hands for rate base purposes. The company urged continuation of an historical cost rate base on the order of $18,000,000. The PUC's staff put forward a figure of something in excess of $8,000,000, approximately the amount Transit had paid for its predecessor's facilities. The PUC rejected both. It thought the staff's recommendation too low because it would provide a coverage of only 1.3 times the interest on the company's debt, a margin which it not surprisingly regarded as unsafe; and it also thought that this figure was inadequate to create the earnings climate required to assure the riding public's most urgent need — new equipment. It fixed upon a rate base of approximately $13,000,000, which represented an averaging of the historical cost rate base claimed by Transit, on the one hand, and, on the other, a rate base reflecting a deduction from historical cost of the entire Acquisition Adjustment Account of roughly $10,000,000, which was set up on Transit's books at the time of the purchase, and the benefit of which has since been given to the riders through its annual application to depreciation charges.[50]
 
 
 56
 We cannot say, any more than has the Commission, that the PUC purposefully employed the compromise rate base as a concealed device for recouping the obsolescent investment in rail properties. It specified its reasons for what it did, and these seem to us fully consistent with the absence of any such purpose. They add up, in sum, to what was known to Congress as well as to the man in the street at the time Transit appeared in the picture, namely, that public surface transportation had come to a complete halt, that no one could know with certainty that traffic would flow back fully to public transportation after its breakdown and riders had become used to other ways of getting around, that a complete renovation and rehabilitation of the facilities was imperative, that both lenders and equity investors would approach such a situation with the greatest circumspection, and that the assurance of significant margins between income and outgo was essential if the riders were to be given some assurance of continuity of service as well as provided with the kind of service they were entitled to have. In this setting it is not enough to point out that the earnings upon equity have been substantial. They were bound to be so to the extent that interest requirements were adequately cushioned in a situation where debt was high and equity was low, and the hopes as to traffic volume were realized. If traffic estimates had proved wrong, another cessation of operations might well have resulted from bankruptcy and the foreclosure of liens upon the equipment. There had to be some prospect that earnings would be substantial in order to guard against this contingency and to attract private investors at all to this desperate and unhappy situation, as Congress well knew when it passed the Franchise Act in full cognizance of the debt-equity ratio that was to obtain in Transit. They had, moreover, to be significant to assure the availability of financing for the new equipment so urgently required. That they perhaps materialized in fact proves no more than that the PUC's stated objectives in fixing upon the compromise rate base have been achieved, not that these objectives were different from what they purported to be. We do not, therefore, disturb the Commission's conclusion that this depreciation allowance of $693,870 in respect of abandoned rail properties does not duplicate earlier recoupment of this cost in another form.
 
 
 57
 A second attack upon the $693,870 is founded upon the sale by Transit of two pieces of property. Because these sales were occasioned, so it is said, by the conversion program, the contention is that the profits realized should be regarded as recoupment of obsolescence. The principal transaction is Transit's sale in 1959 of its Fourth Street Shops to the D. C. Redevelopment Land Agency. Because this sale was made under threat of condemnation for a public purpose, Transit argues that it was not part of the conversion program; and in this regard it points out that operating needs required it to replace these shops with new maintenance facilities costing far in excess of the profits from this sale. We think there is some force to Transit's contention, especially in view of the essentially equitable character of petitioners' argument. We note also that the PUC did not omit to give the riding public some considerable share in the benefits of this sale. As pointed out in the intervenor's brief, the profit on the depreciable property which went into surplus was $837,000. At the time of the sale, Transit carried this property on its books at an historical cost of $1,077,824, with an accrued depreciation reserve of $613,661. Thus only $464,163 was required from the proceeds of the sale to effect complete liquidation of this investment. The PUC, however, ordered a total of $1,077,824 be credited to the depreciation reserve, representing not only the $464,163 but an additional amount of $613,661 exactly duplicating the reserve already accrued. It was this action that we think was explained by the PUC's comment that equitable considerations suggested the riders should share in the profits from the sale.[51] Under all these circumstances, therefore, we do not interfere with the Commission's discretion in deciding not to off-set the profits from the Fourth Street shop sale against the $693,870.
 
 
 58
 The second transaction is Transit's sale in December, 1962, of a terminal at the intersection of Georgia and Eastern Avenues. Petitioners claim that Transit realized a capital gain of $183,357 on the depreciable part of this property and that, since this sale was assertedly attributable to the conversion program, this figure should be applied against the $693,870. The exact accounting treatment of this transaction is not before us, nor was it before the Commission, because the recency of the sale apparently prevented its being recorded before the close of the audit period on which this proceeding is based. Transit contends that the evidence of record shows that this sale did not result from the conversion program and that, accordingly, the premise of the claim falls.
 
 
 59
 The only evidence before the Commission regarding this sale does indicate that the terminal was sold more than three months after the close of the audit period on which the Commission's projections are based.[52] This may explain why no effort was made by any party to establish the reasons for the sale. A staff witness, whose testimony provides the basis for petitioners' claim here, refused to attribute the sale to the conversion program, pointing out that before it was sold the terminal "was used for bus operations also."[53] His statement, however, suggests that it may have been used in Transit's rail operations as well; and it may or may not be true that the sale was in some way related to Transit's conversion to an all-bus system. If it was, the Commission should address itself to the question, as did the PUC in the case of the Fourth Street Shops, of whether the riders should be afforded some participation in the benefits of the sale. See note 51 supra. Since the $693,870 depreciation allowance is nonrecurring and will complete the write-off of Transit's rail properties, these questions ought to be resolved at the earliest opportunity. Following our remand, see p. 52 infra, the Commission should determine whether the sale of the terminal was occasioned, in whole or in part, by the abandonment of rail operations, and, if it was, whether and to what extent the farepayers should share in the proceeds.
 
 
 60
 The third reason urged by petitioners why the Commission should have reduced the $693,870 depreciation allowance rests on the claim that some of Transit's abandoned rail equipment has yielded substantially more than its estimated salvage value. They contend that any such excess should offset the $693,870. The Commission conceded that, on the basis of the tentative figures provided by its staff, "there may be an over-accrual projected as of August 15, 1963, of $305,559" on the unrecovered costs of rail facilities. But because "offsetting under-accruals in other accounts may also develop by August 15, 1963," it postponed consideration of this question until all the results were in.[54] Petitioners' argument seems to be that the Commission had evidence before it that Transit had already realized some $372,000 in excess salvage value, and that therefore, in a proceeding to set fares for the future, it was error to ignore that fact simply because of the mere possibility that a subsequent accounting would reveal under-accruals in other accounts.
 
 
 61
 The evidence before the Commission on this issue consisted of two exhibits prepared by its staff and the testimony of one of its staff members. One of the exhibits, entitled "Depreciation of Rail Facilities," projected Transit's unrecovered costs as of August 15, 1963, at $791,638, or $305,559 less than originally estimated. The other revealed that, as of November 30, 1962, Transit had realized $372,132 more for some of its abandoned equipment than had initially been expected. As the Commission recognized, the figure of $305,559 represents an estimate made in advance of the test year of an over-accrual nearly a year later. It did not, as the intervenor has intimated to us, constitute an over-accrual existing at the time the Commission issued its order. The figure of $372,132 represents excess salvage that Transit had realized as of a date three months after the close of the audit period, and the record does not reveal, nor have petitioners or the intervenor suggested, what part of that sum had been realized prior to August 31, 1962. The staff witness who had prepared the exhibit refused to recommend that this $372,132 be used to offset the $693,870 depreciation allowance, for "it may very well be that the $372,000 in excess salvage in rail facilities has been offset up to this point by a deficiency of salvage over estimate, or under estimate, in other items of property."[55] And in any case, he testified, a final answer would have to await another depreciation reserve study.
 
 
 62
 On this record we cannot say that the Commission's decision to postpone resolution of this question was erroneous. In Bebchick it was undisputed that the bus company had already accumulated a depreciation reserve substantially greater than the original cost of the property, and we therefore held that the PUC could not permit accruals to continue on the same basis until such time as it was able to make a "complete study of the problem." Here the evidence was incomplete and contradictory, and based largely on transactions that occurred after the close of the audit period. By now, however, all the results are in. August 15, 1963, has come and gone since the Commission entered its order. Presumably it is in a position to determine by how much actual net salvage exceeded the original estimate and thus compute the amount of any over-accrual of depreciation. On remand, therefore, the Commission should undertake to perform these computations and make any necessary adjustment in the $693,870 allowance.
 
 Nos. 17,953 and 17,954
 
 63
 Transit, the petitioner, and the intervenor alike attack the Commission's finding that a return of 4.87 per cent on gross operating revenues is "just and reasonable." Transit's argument essentially is that the Commission's finding is unsupported by substantial evidence, and that, in any event, a 4.87 per cent return is inadequate as a matter of law. Except for the points we have already discussed, however, Transit does not challenge the figures on which the Commission based its order, nor its estimate of the revenues Transit will earn at the fares allowed. The petitioner and the intervenor claim that the Commission relied solely, and thus erroneously, on the operating ratio method, disregarding all other criteria of a reasonable return. Specifically, they contend that the Commission mistakenly ignored the source and cost of Transit's capital requirements, the return on its rate base,[56] and the return on equity investment. They further contend that the Commission improperly relied on an earlier order of the Public Utilities Commission fixing Transit's return at 4.92 per cent.[57] And they, too, claim that the Commission's order lacks support in its findings or the evidence before it.
 
 
 64
 We express no opinion regarding the adequacy or inadequacy of the return allowed by the Commission, for we think that its order in this respect does not admit of the kind of meaningful judicial review contemplated by the statute. It appears to us likely that the Commission too narrowly conceived the scope of its inquiry under the operating ratio method, although, on this record, we can say only that the path it actually followed cannot confidently be discerned. Colorado Interstate Gas Co. v. Federal Power Comm'n, 324 U.S. 581, 595, 65 S.Ct. 829, 89 L.Ed. 1206 (1945). The Commission concluded that Sections 6(a) (3) and (4) of the Compact required it to "`prescribe just and reasonable fares' based on the operating ratio theory of rate making." By virtue of Congress' mandate, therefore, it thought it was "not permitted to give significant consideration to return on equity," nor obligated to give more than "little consideration to return on [Transit's] * * * rate base." The Commission did concede that it was obligated to strike a balance between the interests of the company's stockholders and those of the riders by assuring sufficient revenues to cover expenses and capital costs while at the same time giving weight to the need for adequate, low-cost service. But it nevertheless insisted that,
 
 
 65
 "in determining reasonable earnings under the aforementioned guide lines * * * primary consideration must be given to the operating ratio theory and * * * only minor consideration need be given the other factors brought into issue."[58]
 
 
 66
 We do not quarrel with the Commission's conclusion that Congress intended that the operating ratio method should be the primary test of the reasonableness of Transit's fares. But the language that appears in its order strongly suggests that it misunderstood what that test entails. In Federal Power Comm'n v. Hope Natural Gas Co., 320 U.S. 591, 602, 64 S.Ct. 281, 287, 88 L.Ed. 333 (1944), the Supreme Court enunciated what is now a fundamental principle of rate regulation: "Under the statutory standard of `just and reasonable' it is the result reached not the method employed which is controlling." (Emphasis added.) The Court went on to point out that, in balancing investor and consumer interests, it is essential to consider the capital costs of the enterprise. 320 U.S. at 603, 64 S.Ct. 281. Here, unlike the Hope case, Congress has specified what method of rate making the Commission should employ, but in so doing it did not relieve the Commission of the necessity of making the kind of inquiry that must be made if the statutory standard is to be complied with. A "just and reasonable" rate is one that assures that all the enterprise's legitimate expenses will be met, and that enables it to cover interest on its debt, pay dividends sufficient to continue to attract investors, and retain a sufficient surplus to permit it to finance down payments on new equipment and generally to provide both the form and substance of financial strength and stability. A rate fixed without particularized reference to these needs does not satisfy any standard of rate making of which we are aware, including that of return on operating expenses. The operating ratio method does not make such an inquiry irrelevant; indeed, it was in part the failure of rates established by the rate base method to cover the capital costs of most motor carriers that led to its adoption.[59] An enterprise's operating ratio — the arithmetical ratio of its expenses to its gross revenues — may suggest that its rates are too high or too low, but whether they are too high or too low in fact depends in the final analysis on the degree of their correspondence to the items mentioned above. Rates that will produce an operating ratio of 95.13, therefore, do not possess some inherent validity, and whether they are proper in a given case requires a more detailed inquiry than the Commission here seems to have made.
 
 
 67
 We know from this figure of 95.13 only that the legitimate operating expenses found by the Commission — and we accept that legitimacy in this case — account for all but 4.87 per cent of the total revenues expected to be realized from the approved fare structure. We need to know more than we have been told about why the Commission thought this was the appropriate margin. The fixing of that margin is not in truth a process so greatly different from what is done in determining rate of return in traditional rate-base rate-making. There also the gross revenues allowed are to cover legitimate operating expenses in the first instance — and something more. That something more is the sum of money needed to attract the capital, both debt and equity, required to insure financial stability and the resulting capacity of the utility to render the service upon which the public depends. To determine that sum entails inquiries and findings — judgmental as the latter may often be because rate-makers must be prophets of the future as well as historians of the past — into such things as the capital programs in prospect, what such programs entail in terms of down-payments as well as financing, the cost of borrowing money, working capital needs, the desirable ratio of debt to equity, the incentives required by a stockholder to keep his money in the business and the dividends and growth rates requisite to supply these incentives, the opportunities in these respects provided in comparable businesses, and the related matters which must be prayerfully explored by the conscientious regulator before he can begin to say why he fixed upon 4.87 rather than 6.5 or 3.2.
 
 
 68
 A change from one rate-making method to another does not, we repeat, dispense with the necessity for this kind of inquiry. And any hopeful confidence we might have that such an inquiry may have been made but not articulated is scarcely enhanced by the Commission's statements to the effect that it did not regard it as either relevant or required under the operating ratio method — an error of which the Commission, as a new agency making its first start in the rate-making field, should be disabused at the outset in the interest of avoiding future difficulties. In any event, the Commission has described its deliberations and conclusions on this fundamental aspect of the case in terms of stock generalizations which serve only to frustrate, rather than illuminate, judicial review.
 
 
 69
 We are assured by the Commission that it considered Transit's "operating and financial needs * * * and all other relevant factors" in arriving at a return of 4.87 per cent. It says that it found that the new fares would "produce reasonable net revenues to allow [Transit] * * * to service its debt, pay reasonable dividends, retain a reasonable portion in its business and to attract investments of private investors." But what facts it relied on the Commission does not say. It had before it a statement of Transit's current annual interest charges, but it seems to have made no inquiry into the cost to Transit of borrowing money, nor to have considered what Transit's future requirements in this regard are likely to be. Transit's annual dividend pay-out of about $500,000 appears to have been treated as if it were a cost of operation, like the annual expenditure for gas and oil, with no examination of, or conclusion about, its appropriateness. There is no suggestion in the Commission's opinion that it examined earnings on investments carrying comparable risks, or took into account Transit's peculiar capitalization. The Commission does not mention, if it considered, Transit's future equipment needs, if any, and how, or on what terms, such equipment could be financed. In short, we are left with only its assurance that it did in fact consider Transit's financial needs "and all other relevant factors." We do not know nor can we divine from the record what those needs are, much less what the Commission found them to be. Under these circumstances, our review can be no more than a "perfunctory process." Colorado Interstate Gas Co. v. Federal Power Comm'n, 324 U.S. 581, 605, 65 S.Ct. 829, 89 L.Ed. 1206 (1945).
 
 
 70
 Transit began its life with a capitalization in which debt was heavily, and indeed strikingly, preponderant. As noted hereinabove, this was known to Congress when it passed the Franchise Act and directed that the rates then in effect be continued. This made inevitable large returns on equity to the extent that the relatively heavy interest requirements were safely covered and the gamble on traffic levels after the resumption of operations was won. The urgency of the problem of traffic uncertainty has, however, receded appreciably into the past. Although it continues to exist to some degree by reason of the seemingly inexhaustible enthusiasm of motorists and highway builders, on the one hand, and persistent speculation about rail rapid transit, on the other, we think the time has come for the Commission to make a careful review and analysis of the earnings experience of Transit from its inception, and of what that experience has meant to the equity owners, both by way of dividend payments and growth in book values through retained earnings. We do not see how current fare increases can properly be appraised apart from such a study, and the reflection of its results in the articulation of the Commission's decision as to the margin of revenues over expenses appropriate to today's needs, as distinct from the crisis conditions of nearly a decade ago. It seems clear that Congress, by reason of the unusual specifications contained in the Franchise Act, intended the returns to be generous, for the purpose of restoring the then shattered public transit system to some semblance of stability. But if a measure of stability has been achieved, then the present ability of Transit to attract the capital it needs on relatively favorable terms may well be superior to what it was in the earlier years of its life. At least we cannot know that this is not true, unless the Commission identifies the role thus far played by Transit's earnings in bringing about such a condition.
 
 
 71
 This matter of earnings is the more important in the light of Congress' direction to the Commission, in Section 6(a) (3) of the Compact, to give due consideration in setting fares "to the need, in the public interest, of adequate and efficient transportation service by such carriers at the lowest cost consistent with the furnishing of such service." The Commission is thus required to see to it that the fare-payers pay no more than is necessary to ensure the continued adequacy of the company's service and provide a return to the shareholders that is reasonable under the circumstances. The Commission in its opinion recognized that, "in the final analysis, the matter of fixing just and reasonable rates involves a balancing of the investor and the consumer interests"; and we do not doubt its purpose to find that balance. Our difficulty, as we have said, arises from the Commission's failure to provide us an adequate basis for knowing why it did what it did.
 
 
 72
 We thus have no intelligible basis for disposing of the competing claims before us that the return allowed by the Commission is, on the one hand, too high, and, on the other, too low. We remand the case to the Commission for further proceedings consistent herewith to determine the margin of return over and above operating expenses that Transit should be allowed.
 
 
 73
 It is so ordered.
 
 
 
 Notes:
 
 
 *
 Circuit Judge Wilbur K. Miller became Senior Circuit Judge on October 16, 1964, and Circuit Judge Bastian became Senior Circuit Judge on March 17, 1965
 
 
 [1]
 The cash fare, as indicated above, was to remain 25¢. Transit also carries school children at a fare of 10¢, sold in units of ten for $1.00
 
 
 [2]
 In its application, Transit used the actual operating results for the twelve-month period ending August 31, 1962, for purposes of projecting future revenue and expenses. It selected the calendar year 1963 as the future annual, or test, period for which revenue and expenses were to be projected. The appropriateness of neither choice is challenged in these appeals
 
 
 [3]
 The Washington Metropolitan Area Transit Commission, like the District of Columbia Public Utilities Commission before it, used the operating ratio theory of rate-making in arriving at what it found were "just and reasonable" fares. This, the Commission claims, it was required to do by Section 6(a) (4) of the Compact. The United States does not contest the Commission's use of this method. Nor do petitioners in No. 17,954, although they do argue that the Commission should not have relied on the operating ratio as the sole test of Transit's fares, see text accompanying notes 56-59infra.
 The operating ratio theory of rate-making, which has been widely employed in the regulation of the fares or rates of motor transportation enterprises, "in effect," as the Commission recognized, "allows a return on operating expenses." As defined by the Interstate Commerce Commission, the term "operating ratio" means "the percent which a carrier's direct operating expenses is to its total operating revenue." Increased Common Carrier Truck Rates in the East, 42 M.C.C. 633, 647 n. 5 (1943).
 
 
 [4]
 Section 17(a) of the Compact provides:
 "Any party to a proceeding under this Act aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the court of appeals of the United States for the fourth circuit, or in the United States Court of Appeals for the District of Columbia, by filing in such court, within sixty (60) days after the order of the Commission upon the application for rehearing, a written petition praying that the order of the Commission be modified or set aside. * * *"
 
 
 [5]
 The reference is to the Public Utilities Commission of the District of Columbia, see Franchise Act § 3, under whose jurisdiction Transit remained until the establishment of the Washington Metropolitan Area Transit Commission in 1960
 
 
 [6]
 Section 9 reads in pertinent part as follows:
 "(a) Except as hereinafter provided, the Corporation shall not, with respect to motor fuel purchased on or after September 1, 1956, pay any part of the motor vehicle fuel tax levied under the Act entitled `An Act to provide for a tax on motor vehicle fuels sold within the District of Columbia, and for other purposes' * * *.
 "(b) For the purposes of this section —
 "(1) the term `a 6½ per centum rate of return' means a 6½ per centum rate of return net after all taxes properly chargeable to transportation operations, including but not limited to income taxes, on the system rate base of the Corporation, except that with respect to any period for which the Commission utilizes the operating ratio method to fix the rates of the Corporation, such term shall mean a return of 6½ per centum net after all taxes properly chargeable to transportation operations, including but not limited to income taxes, based on gross operating revenues;
 * * * * *
 "(c) As soon as practicable after the twelve-month period ending on August 31, 1957, and as soon as practicable after the end of each subsequent twelve-month period ending on August 31, the Commission shall determine the Corporation's net operating income for such twelve-month period and the amount in dollars by which it exceeds or is less than a 6½ per centum rate of return for such twelve-month period. In such determination the Commission shall include as an operating expense the full amount of the motor vehicle fuel tax which would be due but for the provisions of this section on the motor fuel purchased by the Corporation during the twelve-month period, and the full amount of the Federal income taxes and the District of Columbia franchise tax levied upon corporate income. The Commission shall certify its determination to the Commissioners of the District of Columbia or their designated agent. If the net operating income so certified by the Commission equals or is more than a 6½ per centum rate of return, the Corporation shall be required to pay to such Commissioners, or their designated agent, the full amount of the motor vehicle fuel taxes due on the purchases of motor fuel made by the Corporation during such twelve-month period. If the net operating income so certified is less than a 6½ per centum rate of return, the Corporation shall pay to such Commissioners, or their designated agent, in full satisfaction of the motor vehicle fuel tax for such period an amount, if any, equal to the full amount of said motor vehicle fuel tax reduced by the amount necessary to raise the Corporation's rate of return to 6½ per centum for such period * * *."
 
 
 [7]
 See generallyMiddle West General Increases, 48 M.C.C. 541, 552-53 (1948); Increased Common Carrier Truck Rates in the East, 42 M.C.C. 633, 647-48 (1943).
 
 
 [8]
 See 42 M.C.C. at 647. See generally, NICHOLS, RULING PRINCIPLES OF UTILITY REGULATION: RATE OF RETURN 438-39 (1955); Wright,Operating Ratio — A Regulatory Tool, 51 PUB. UTIL.FORT. 24-29 (1953).
 
 
 [9]
 Or perhaps, more accurately, it was the apparent excessiveness of adequate returns expressed in traditional return-on-rate-base terms. See Knappen,Transit Operating Ratio — Another View, 51 PUB.UTIL.FORT. 485, 492 (1953).
 
 
 [10]
 The Commission did not compute Transit's "system rate base," asserting that "in view of the specific language of the Compact * * * it need give little consideration to return on applicant's rate base." See Order No. 245 (Application of D. C. Transit System, Inc.), Washington Metropolitan Area Transit Commission, p. 44. In the company's last previons rate case, the District of Columbia Public Utilities Commission fixed its rate base at $16,821,310. SeeD. C. Transit Sys., Inc., 38 P.U.R. 3d 19, 46 (1961). This figure was based on an earlier decision of the Commission, Order No. 3592 (In the Matter of Determining the Net Operating Income of D. C. Transit System, Inc.), November 27, 1957, in a proceeding to determine the liability of Transit for motor fuel taxes for the previous year. See note 6 supra and accompanying text. The PUC had sought to strike an equitable balance between the book value, or original cost, of the company's properties in the hands of its predecessor, Capital Transit, and the price Transit paid for those properties. It used this "compromise" rate base, brought up to date, to test the company's rate of return on three later occasions. Transit's exhibits in this proceeding put its system rate base in 1961, computed on the basis of the depreciated original cost of its properties, at $20,015,364. Its "compromise" rate base during that year, by its own calculation, was $17,443,277.
 
 
 [11]
 See 102 CONG.REC. 7552, 8280 (1956); S.REP.No.1791, 84th Cong., 2d Sess. (1956)
 
 
 [12]
 102 CONG.REC. 8288 (1956) (Remarks of Representative Wolverton). (Emphasis added.)
 
 
 [13]
 102 CONG.REC. 8292 (1956). (Emphasis added.)
 
 
 [14]
 See H.R.REP.No.2751, 84th Cong., 2d Sess. 2 (1956) (Conference Report)
 
 
 [15]
 See 102 CONG.REC. 13580 (1956). Representative Harris seems to have regarded the rate provisions as basically unchanged: "Thesame general tax concessions based upon a 6½ percent return, handling of rate matters * * * as were in the House bill, are in the franchise here proposed." Ibid. (Emphasis added.)
 
 
 [16]
 In an all-bus operation, Transit's annual operating expenses would far exceed its capital investment. Moreover, Transit's investment would appear unusually small since it would be acquiring Capital's properties at far less than their book value. The House bill, see text accompanying notes 11-12supra, would have required Capital to undertake a program of conversion to bus operations, but Capital would not have had to labor under fares fixed by reference to a suddenly deflated rate base.
 
 
 [17]
 Between 1946 and 1956, Capital Transit's actual return never exceeded 5.7%, and only in one year did it go above 5.0%. Four times during that period Capital's return fell below 3.0%, and in 1955 it ran a deficit. See Exhibit No. DCT-38B, p. 102 of the Joint Appendix. See also the testimony of J. A. B. Broadwater, President of Capital Transit Co.,Hearings on Washington (D.C.) Metropolitan Transit Authority Before a Sumcommittee of the House Committee on Interstate and Foreign Commerce, 84th Cong., 2d Sess. 261 (1956). A return in the neighborhood of 6.5% on its system rate base, therefore, would have been a substantial improvement over what Transit's predecessor had been earning. See also text accompanying notes 30-31 infra.
 
 
 [18]
 Franchise Act § 4 required that "the Commission [PUC] should encourage and facilitate the shifting to such gross operating revenue base as promptly as possible and as conditions warrant; and if conditions warrant not later than August 15, 1958." See 102 CONG.REC. 13580 (1956)
 
 
 [19]
 SeeD.C. Transit Sys., Inc., 33 P.U.R. 3d 137, 169 (1960); D.C. Transit Sys., Inc., 38 P.U.R.3d 19, 50 (1961).
 
 
 [20]
 SeeHearings on the Regulation of Fares for Schoolchildren in the District of Columbia Before Subcommittee No. 5 of the House Committee on the District of Columbia, 87th Cong., 1st Sess. 17, 20 (1961) (Statements of Harvey M. Spear, Counsel for D.C. Transit System, Inc., and Hon. George E. C. Hayes, Chairman, Public Utilities Commission of the District of Columbia).
 In Bebchick v. Public Util. Comm'n, 115 U.S.App. 216, 318 F.2d 187, cert. denied, 373 U.S. 913, 83 S.Ct. 1304, 10 L.Ed.2d 414 (1963), reviewing the PUC's order in 33 P.U.R.3d 137, a majority of this court said:
 "In reference to this provision [Franchise Act § 4] we note that the Commission, we think properly, did not consider a return of 6½ per centum net to be required, if less were reasonable and met the need to attract private investors."
 115 U.S.App.D.C. at 219, 318 F.2d at 190. (Emphasis added). Bebchick, however, was an appeal by representatives of the transit riding public, and thus the issue before us now was not squarely before the court in that case.
 
 
 [21]
 Transit is required by the predecessor version of § 214a, now the first paragraph of that section, to carry children under the age of eighteen to and from school at a fare that cannot exceed "more than one-half the cash fare * * * for regular route transportation within the District of Columbia." See 44 D.C.Code § 214a (1961) and 44 D.C.Code § 214a (Supp. IV 1965)
 
 
 [22]
 SeeHearings on the Regulation of Fares for Schoolchildren in the District of Columbia Before Subcommittee No. 5 of the House Committee on the District of Columbia, 87th Cong., 1st Sess. 1 (1961).
 
 
 [23]
 Seeid. at 2-4; 108 CONG.REC. 8264 (1962) (S. 1745; passed by the Senate the preceding year).
 
 
 [24]
 108 CONG.REC. 8266 (1962). (Emphasis added.)
 
 
 [25]
 This is not, strictly speaking, a case of congressional reenactment following an administrative construction. Nonetheless, Section 214a is closely related to the rate making sections of the Franchise Act and the Compact, and its operation depends, as Congress well recognized, upon the Commission's interpretation and application of those sections. Moreover, it was in part intended to achieve the same purpose: to ensure that Transit remain a viable, privately-owned enterprise. Had Congress thought the Commission's construction of the 6.5% language was contrary to its purpose, it would have been a simple matter to say so. Instead, Congress deleted the language that might have sustained any remaining doubts about its original intention. See United States ex rel. Lyons v. Hines, 70 U.S.App.D.C. 36, 41, 103 F. 2d 737, 742 (1939)
 
 
 [26]
 See H.R.REP.NO. 1621 (Washington Metropolitan Area Transit Regulation Compact), 86th Cong., 2d Sess. 12 (1960);Hearings on District of Columbia, Maryland, and Virginia Mass Transit Compact Before a Special Sub-committee of the Senate Committee on the Judiciary, 86th Cong., 2d Sess. 125 (1960).
 
 
 [27]
 In 1958, the PUC authorized a rate of return of 6.17% on Transit's system rate base of $14,167,375, substantially less than 6.5% on gross operating revenuesD.C. Transit Sys. Inc., 25 P.U.R.3d 371 (1958).
 
 
 [28]
 Essentially, Transit argues that Section 9 was intended to help insure that it would earn a return of 6.5% — a means of supplementing Section 4's "guarantee" of the opportunity to earn that return. If Section 4 is not read as guaranteeing Transit that opportunity, Transit's argument runs, "the Section 9 tax exemptions * * * [are] wholly unrelated to any over-all purpose and plan evinced in the statute." Brief for Petitioner D.C. Transit Sys., Inc., p. 15
 
 
 [29]
 Sections 4 of the Franchise Act and 6(a) (4) of the Compact do suggest other criteria, as we indicate below. See note 33infra.
 The construction we urge seems to have been the one adopted by the PUC on the only occasion it had to consider Transit's liability for motor fuel taxes. On that occasion the PUC compared 6.5% of the company's rate base with its actual return for the previous year to determine whether the exemption was available. Order No. 3592 (In the Matter of Determining the Net Operating Income of D.C. Transit System, Inc.), November 27, 1957. A year later, in a proceeding to review Transit's fares, the PUC allowed the company a return of only 6.17% on its system rate base. So far as appears, there was no suggestion at the time that two orders were fatally inconsistent.
 
 
 [30]
 According to Transit's own figures, 1951 marked the high point of Capital Transit's post-war earnings. Capital's rate of return in 1946 was 4.5%; in 1947, 0.8%; in 1948, 2.3%; in 1949, 2.5%; and in 1950, 4.6%. See Exhibit No. DCT-38B, p. 102 of the Joint Appendix
 
 
 [31]
 SeeHearings on Transportation of Schoolchildren in the District of Columbia Before the House Committee on the District of Columbia, 87th Cong., 2d Sess. 9 (1962).
 
 
 [32]
 In 1958, the PUC allowed Transit a return of 6.17% on its system rate base. See note 27supra. In the two rate proceedings it conducted after shifting to the operating ratio standard, the PUC fixed Transit's fares to provide returns of, respectively, 4.10% and 4.92% of gross operating revenues, or, as translated by the PUC, 7.14% and 8.31% on the company's existing rate base. See D.C. Transit Sys. Inc., 33 P.U.R.3d 137, 169 (1960); D.C. Transit Sys. Inc., 38 P.U.R.3d 19, 50 (1961). But on neither occasion, apparently, did the Commission consider itself bound, or even constrained, by the language of § 4 of the Franchise Act to reach these latter results. In each instance it sought to determine what would be a fair return in the light of Transit's own current needs.
 
 
 [33]
 Section 4 itself implies that the principal criterion is reasonableness, and not any fixed mathematical standard: "a return of at least 6½ per centum * * * would not beunreasonable." (Emphasis added.) Section 6(a) (2) of the Compact provides that the Commission shall set lawful fares whenever it finds the fares proposed by the carrier to be "unjust, unreasonable, or unduly preferential or unduly discriminatory," and Section 6(a) (3) sets forth a long list of factors that the Commission should consider in prescribing "just and reasonable fares and regulations":
 "[T]he Commission shall give due consideration, among other factors, to the inherent advantages of transportation by such carriers; to the effect of rates upon the movement of traffic by the carrier or carriers for which the rates are prescribed; to the need, in the public interest, of adequate and efficient transportation service by such carriers at the lowest cost consistent with the furnishing of such service; and to the need of revenue sufficient to enable such carriers, under honest, economical, and efficient management, to provide such service."
 Certainly the PUC assumed that it was obligated as well as empowered to consider other factors:
 "[A] fair return should provide sufficient income, over and above all expenses, to meet interest requirements on debt capital, allow the payment of reasonable dividends, and, in addition, permit the retention of some portion of earnings in surplus."
 D.C. Transit Sys., Inc., 33 P.U.R.3d 137, 169 (1960); see id. at 171; 38 P.U.R.3d at 48.
 
 
 [34]
 "SEC. 7. The Corporation shall be obligated to initiate and carry out a plan of gradual conversion of its street railway operations to bus operations within seven years from the date of the enactment of this Act upon terms and conditions prescribed by the Commission, with such regard as is reasonably possible when appropriate to the highway development plans of the District of Columbia and the economies implicit in coordinating the Corporation's track removal program with such plans; except that upon good and sufficient cause shown the Commission may in its discretion extend beyond seven years, the period for carrying out such conversion. * * *"
 
 
 [35]
 See Compact § 17(a): "The finding of the Commission as to the facts,if supported by substantial evidence, shall be conclusive." (Emphasis added.)
 
 
 [36]
 Bebchick v. Public Util. Comm'n, 115 U.S.App.D.C. 216, 222, 318 F.2d 187, 193, cert. denied, 373 U.S. 913, 83 S.Ct. 1304, 10 L.Ed.2d 414 (1963)
 
 
 [37]
 See Order No. 245 (Application of D.C. Transit System, Inc.), Washington Metropolitan Area Transit Commission, p. 14:
 "Thus, it is not completely proper to suggest that the ten-year period was established arbitrarily. It is more accurate to say that it was an appropriate time period in light of all the circumstances existing at the time, particularly, in view of the treatment accorded, in the same Order, the track removal program."
 (Emphasis added.)
 
 
 [38]
 44 D.C.Code § 214a reads in pertinent part as follows:
 "If, after giving effect to any and all motor vehicle fuel tax and real estate tax exemptions, the net operating income from mass transportation operations in the District of Columbia of any common carrier required to furnish transportation to schoolchildren at a reduced fare under this section for any twelve-month period ending August 31 is less than the rate of return established by the regulatory commission having jurisdiction in such carrier's last rate case, net after all taxes properly chargeable to transportation operations, including but not limited to income taxes, on its gross operating revenues in the District of Columbia, exclusive of any school fare subsidy, then the Washington Metropolitan Area Transit Commission shall, as soon as practicable after such August 31, certify to the Commissioners of the District of Columbia or their designated agent with respect to such twelve-month period: (1) an amount which is the difference between the total of all reduced fares paid to each such carrier by schoolchildren in accordance with this section and the amount which would have been paid to each such carrier if such fares had been paid at the lowest adult fare established by the Commission for regular route transportation; and (2) an amount which is the amount by which each such carrier's net operating income from mass transportation operations in the District of Columbia is less than such rate of return established by the appropriate regulatory commission in the carrier's last rate case, after giving effect to the aforesaid tax exemptions, exclusive of any such school fare subsidy. Upon such certification, the Board of Commissioners of the District of Columbia shall pay to each such carrier an amount equal to the amount certified pursuant to clause (1) thereof [sic]; except that in no event shall such amount exceed the amount certified pursuant to clause (2) hereof."
 
 
 [39]
 See Order No. 245 (Application of D.C. Transit System, Inc.), Washington Metropolitan Area Transit Commission, p. 35
 
 
 [40]
 Hearings on Regulation of Fares for Schoolchildren in the District of Columbia Before Subcommittee No. 5 of the House Committee on the District of Columbia, 87th Cong., 1st Sess. 3 (1961) (Letter from the President of the D.C. Board of Commissioners to Committee Chairman McMillan). See Hearings on Transportation of Schoolchildren in the District of Columbia Before the House Committee on the District of Columbia, 87th Cong., 2d Sess. 1 (1962).
 
 
 [41]
 See S.REP.No.875, 87th Cong., 1st Sess. 4 (1961)
 
 
 [42]
 107 CONG.REC. 21289 (1961). (Emphasis added.)
 
 
 [43]
 H.R.REP.No.1629, 87th Cong., 2d Sess. 2 (1962). (Emphasis added.)
 
 
 [44]
 See 108 CONG.REC. 8267 (1962)
 
 
 [45]
 Brief for Petitioners Richard A. Williams and Alfred S. Trask, p. 22. The quoted language appears in a footnote which reads in its entirety as follows:
 "Petitioners do not necessarily suggest that the full amount of the available subsidy be considered available revenue in setting fares. WMATC should perhaps recognize somewhat less than the full amount of the available subsidy and leave a cushion to guard against any unforeseen contingencies."
 
 
 [46]
 In 1960, the Public Utilities Commission permitted Transit to add $295,500 annually to its normal depreciation charge to enable it to recover 49.40% of the cost of the rail facilities already abandoned and to be abandoned, by August 15, 1963, the end of the conversion period. In the present proceeding, the Commission found that, even with this addition, Transit would still be $693,870 short on August 15, 1963. It therefore has allowed the company to recover that amount in addition to its regular depreciation charges over the remainder of the conversion period, from January 1 to August 15, 1963. SeeD.C. Transit Sys., Inc., 33 P.U.R.3d 137, 156-57 (1960).
 
 
 [47]
 The Commission relied on an independent study of Transit's depreciation reserve requirements made for the PUC in 1961. That study revealed that Transit would not recover, under its then-existing depreciation rates, the cost of its abandoned rail facilities by August 15, 1963. This, the Commission believed, proved conclusively that the company's stockholders had not already been reimbursed for the risk of obsolescence through high depreciation rates. Petitioners have cited no evidence to the contrary. The Commission also examined Transit's (and its predecessor's) returns for the preceding 28 years, and every rate order issued during that period, and found no evidence that the regulatory authority, in setting the company's rates, had allowed "any additional compensation for the risk of obsolescence." Nor have we. See Order No. 245 (Application of D.C. Transit System, Inc.), Washington Metropolitan Area Transit Commission, pp. 26-28
 
 
 [48]
 See note 10supra.
 
 
 [49]
 Franchise Act § 5 provides:
 "The initial schedule of rates which shall be effective within the District of Columbia upon commencement of operations by the Corporation [Transit] shall be the same as that effective for service by Capital Transit Company approved by the Commissioners of the District of Columbia * * * in effect on the date of the enactment of this Act, and shall continue in effect until August 15, 1957, and thereafter until superseded by a schedule of rates which becomes effective under this section. * * *"
 
 
 [50]
 See Order No. 3592 (In the Matter of Determining the Net Operating Income of D.C. Transit System, Inc.), November 27, 1957. As we have indicated, see note 29supra, this compromise rate base was first fixed upon in a proceeding to determine the company's liability for motor fuel taxes at the end of its first year of operation. The figure of $13,000,000, however, remained the PUC's starting point for valuing Transit's rate base in each subsequent rate proceeding.
 
 
 [51]
 In ordering Transit to allocate the proceeds of the sale in the manner described, the PUC declared:
 "In light of the franchise of the company requiring a gradual program of conversion from railway to bus operations over a 7-year period from July 24, 1956, we are unable to disassociate the instant transaction from the imminent retirement of all rail property under the mandate contained in the franchise. We cannot ignore the probability that full provision for depreciation will not have been provided when the rail facilities are abandoned and retired by reason of conversion. The company has consistently taken the position that any retirement loss in this connection should be recovered by charges against the customers, and the staff has heretofore indicated its agreement. However, if the customers are to be required to bear the burden of extraordinary retirement losses incident to the whole conversion program, it appears equitable that they should share, at least to some extent, in extraordinary retirement gains of the nature here under consideration."
 D.C. Transit Sys., Inc., 30 P.U.R.3d 405, 412 (1959). In the context of the PUC's order, this paragraph clearly refers to and explains the action it was then taking rather than action that remained to be taken.
 
 
 [52]
 The accounting period is August 31, 1961 to August 31, 1962. See note 2supra.
 
 
 [53]
 The testimony of Melvin E. Lewis, of the Commission's staff, is set forth, p. 282 of the Joint Appendix
 
 
 [54]
 Order No. 245 (Application of D.C. Transit System, Inc.), Washington Metropolitan Area Transit Commission, p. 29. (Emphasis added.)
 
 
 [55]
 This testimony of Melvin E. Lewis, of the Commission's accounting staff, appears, p. 277 of the Joint Appendix. (Emphasis added.) Mr. Lewis also testified that he had some doubt about the propriety of Transit's accounting treatment of salvage, and that, if the company's treatment were in fact incorrect, there was "no large error" in the original estimate
 
 
 [56]
 The PUC on two occasions resorted to the rate base method to "test the reasonableness of the rate of return computed under the gross operating revenue method * * *."D.C. Transit Sys., Inc., 38 P.U.R.3d 19, 45 (1961); see D. C. Transit Sys., Inc., 33 P.U.R.3d 137, 149 (1960). While such an exercise may sometimes be useful, it surely is not essential, and the result reached can never be conclusive. The important thing is not that the result reached by the operating ratio method be compared with that which would have been reached under some other method, but that the operating ratio method be applied rationally and intelligibly in the first instance.
 
 
 [57]
 This objection to the Commission's use of the earlier order reflects a misunderstanding of its opinion. We think that the Commission, essentially, was simply pointing out a mathematical coincidence, namely, that the new fares would produce approximately the same rate of return as the old
 
 
 [58]
 Order No. 245 (application of D.C. Transit System, Inc.), Washington Metropolitan Area Transit Commission, p. 44
 
 
 [59]
 See NATIONAL ASSOCIATION OF RAILROAD AND UTILITIES COMMISSIONERS, 64TH ANNUAL CONVENTION,Report of the Special Committee to Study Principles of Rate Regulation in the Motor Bus Industry 461, 468 (1953).
 
 
 
 74
 J. SKELLY WRIGHT, Circuit Judge (concurring):
 
 
 75
 Whatever system of rate making is used in determining a proper bus fare, two basic questions must be answered: (1) How much money have the owners of D. C. Transit invested in the company, and (2) what has been and what is the return on that investment. Until the Commission answers these two questions in words of one syllable so the public, and the court, can understand, the suspicion of unconscionable profits at public expense will persist. The present bus fare is very close to the highest charged in the country. Until the public knows how much the owners of D. C. Transit are making, and have made, on their investment, the bus riders ought not to be required to pay more.
 
 The Government states in its brief:
 
 76
 "* * * From 1957 through the first eight months of 1962 (for which year the figures were annualized), the Company averaged a 60 percent return on average book equity per year, a figure far in excess of the 23 percent which the PUC found `to be more than sufficient to compensate investors for the use of their funds.' The return for the individual years are (P. 11):
 
 
 77
 "1957 84.3
 1958 58.8
 1959 141.1
 1960 28.3
 1961 29.1
 1962 (8 months annualized) 16.5
 
 
 78
 "Of interest for comparative purposes is the return on book equity made by D. C. Transit's predecessor, Capital Transit Co. (P. 11):
 
 
 79
 "1952 4.4%
 1953 4.3%
 1954 3.0%"
 
 
 80
 In view of this statement by the Government, the Commission in its opinion on remand should set out, year by year, beginning with 1956, the amount of capital actually invested by the owners[1] of D. C. Transit, followed by the earnings, year by year, on that investment. Thus the court, and the public, will know whether the owners of D. C. Transit have been, and will be, fairly compensated for their investment.
 
 
 81
 I am not suggesting that the line of inquiries indicated by the court is not necessary in determining a proper bus fare. Of course, it is. I am saying that the primary inquiry is: How much are the owners of D. C. Transit really making on the money actually invested in the company. The public is entitled to the answer to this question — in plain English.
 
 
 82
 WILBUR K. MILLER, Senior Circuit Judge, dissents.
 
 
 
 Notes:
 
 
 [1]
 Of course, if any capital has been returned to the owners, in any way, the year and amount thereof also should be disclosed